## EASTERN FEDERAL CORPORATION
v.
## AVCO-EMBASSY PICTURES, INC.
### Civ. A. No. 11895.

United States District Court,
N. D. Georgia,
Atlanta Division.
Dec. 29, 1970.
Judgment Modified June 25, 1971.

---

Smith, Cohen, Ringel, Kohler, Martin & Lowe, I. T. Cohen and Scott Charlton, Atlanta, Ga., for plaintiff.

Troutman, Sams, Schroder & Lockerman, Robt. S. Sams, Tench C. Coxe, Milton A. Carlton, Jr., Atlanta, Ga., Javits, Trubin, Sillcocks & Edelman, New York City, for defendant.

## ORDER

EDENFIELD, District Judge.

The plaintiff, Eastern Federal Corporation (formerly known as Meiselman Theaters, Inc.) is a movie exhibitor with theaters located in the two Carolinas, Georgia and Florida. The defendant Avco-Embassy Pictures, Inc. (formerly Embassy Pictures Corp.) is a movie producer and distributor, its head distributing office being in New York. Its Vice President and General Sales Manager (whom it contends is the only person having authority to finally approve the licensing of its pictures) is Mr. D. J. Edele, who is headquartered in New York. It also has a branch office in Atlanta headed by James Frew, who is now Southern Division Manager for the defendant and who was Atlanta Branch Manager in 1967. In 1967 (until December of that year) the Chief Booking Agent for plaintiff was John W. Kirby.

In late spring of 1967 the defendant was coming out with a picture to be called "The Graduate." On June 14, 1967, Frew, the then-branch manager of the defendant, met with Kirby, the booker for the plaintiff, in Charlotte, North Carolina, to negotiate for the sale of pictures by the defendant to the plaintiff. On June 22nd plaintiff and defendant entered into a contract whereby plaintiff was granted the "first run", "exclusive" right to play "The Graduate" in Atlanta at its Coronet Theater "or" at its Cherokee Theater "and" at its Miracle Theater in Smyrna. At this time the Coronet Theater was under construction and it was anticipated that it would be ready in October. No playing dates for those theaters were agreed upon, it being a common practice in the moving picture industry to contract without an agreement as to exact playing dates, the custom in this regard being that playing

dates would later be determined in the following fashion: first, the exhibitor would ask the distributor for certain dates. If the distributor agreed, such dates were confirmed. If for some reason (because of conflicts, etc.) the distributor could not agree to the dates suggested, it would reject the proposed dates and ask the exhibitor to submit others. If the parties could not agree on playing dates in this fashion, the distributor had the ultimate and final authority to arbitrarily assign playing dates. Pursuant to this practice the plaintiff originally suggested as a booking date a run to begin on February 21, 1968, and to end on March 5, 1968. These dates were never accepted by the defendant.

On August 10, 1967, plaintiff asked for a playing date of December 22nd. This was approved by the defendant. Later, however, when it was found that the Coronet would not be open by December 22nd, plaintiff requested another date and cancelled for the Coronet Theater and offered its Toco Hills Theater instead. This was rejected by the defendant. Still later, on December 7th, the plaintiff sent in a request for a playing date of February 21, 1968. No response was received to this request. The defendant contends that it did approve and return this request but its Southern Manager, Frew, admits that this request was never approved by the defendant.

By December of 1967 "The Graduate" had won several global awards and had been nominated for several Academy awards, and at this time the defendant realized that it would be a "hit" picture. Based on this realization, it went back to all its licensees and contract holders, including plaintiff, and demanded increased prices and longer playing terms as a condition of supplying the picture.

On Saturday, February 3, 1968, Mr. Frew, representing the defendant, met with Mr. H. B. Meiselman, representing plaintiff, at the defendant's Atlanta office. Frew told Meiselman that his superior, Edele, insisted that the price and showing periods for "The Graduate" be revised upward. After some colloquy, Meiselman agreed. It being Saturday, no secretary was available to type up the new or revised agreement and Mr. Wayne Chappell, an employee of the defendant (who had formerly also been an employee of the plaintiff), took down the notes of the new agreement on a yellow pad or "work sheet", it being contemplated that the revisions would be typed up in formal manner the following week. In addition to the increase in prices and times, one other change was made in the June 22nd agreement: whereas the original agreement had provided that "The Graduate" was to play at the Coronet "or" the Cherokee Theater in Atlanta, and at the Miracle Theater in Smyrna, the new agreement provided that it was to play at the Coronet "and" the Cherokee Theaters in Atlanta and at the Miracle Theater in Smyrna.

What transpired at this meeting is of critical importance to this case, particularly as respects playing dates. Defendant's witnesses, Frew and Chappell, both insist that they told Meiselman that in no event could the picture start showing in Atlanta later than February 21st. On the other hand Meiselman and plaintiff's local manager, Revis, both insist that the subject of playing dates was never mentioned at this meeting. It is also significant that defendant's Atlanta manager, Chappell, made no mention of a February 21st playing date in the notes contained on his "work sheet." Before leaving this meeting, Meiselman and Frew initialed the work sheet and Meiselman also signed in blank the contract forms on which the new agreement was to be typed. The contract forms were thereafter sent to New York and were typed up, but here the same critical dispute arises. It is undisputed that the contract forms when typed in New York contained a requirement that the opening date for the showing of "The Graduate" be not later than February 21st. Defendant says this was pursuant to their discussions on February 3rd. This is vehemently denied by plaintiff.

Again it is significant that the work sheet prepared at the time and initialed by all the parties contains no such provision. There is also a dispute as to what happened to the forms thereafter. The defendant testifies that the typed forms, containing the February 21st deadline, were approved in its New York office and a copy promptly returned to the plaintiff. The plaintiff denies that this is true and contends that the insertion of the February 21st deadline was done by the defendant without authority and contrary to the February 3rd agreement. It also contends (and its President swears) that they never received the forms or knew of this unauthorized change until March 5th, at which time "The Graduate" was already being shown at a competing theater under license from the defendant, this having come about under circumstances which we will now explain.

Following the February 3rd meeting defendant's Southern Division Manager, Frew, met with plaintiff's local manager, Revis, on February 14th at the Coronet Theater, which was then under construction, and thereafter they had lunch at the Variety Club. Frew testifies that Revis told him that the Coronet Theater would be completed by February 21st but that he, Frew, after having seen the progress being made, had serious reservations about this completion date. In any event, Frew on this occasion found out that Mr. Meiselman was coming back to Atlanta from Charlotte within the next few days and thereafter Frew met with Mr. Meiselman at the Riviera Motel on February 16th. At this meeting Frew testifies that he told Meiselman that the Coronet would not be ready by February 21st and told him further that he, Meiselman, would have to get another theater because the defendant had to have two. At this meeting Frew also suggested for the first time that they might obtain the Westgate Theater to play "The Graduate" along with the Cherokee, since the Coronet would not be finished by February 21st. The Westgate Theater is owned by

Georgia Theaters, a competitor of plaintiff. Meiselman emphatically refused to go along with this arrangement, telling Frew that a showing jointly between the Cherokee and the Westgate would take place "over my dead body" and suggesting that a deal between defendant and a competitor would constitute a breach of its contract with defendant.

Following this exchange, Frew began negotiations with the Georgia Theaters chain in earnest and on February 19th Frew entered into an agreement with Georgia Theaters whereby "The Graduate" would open at the Lenox Theater (owned by Georgia Theaters) exclusively. This agreement wih Georgia Theaters was approved by the defendant's New York office on February 21st, the same day that "The. Graduate" started playing at the Lenox Theater.

As a result of this series of transactions, "The Graduate" was never shown by any of plaintiff's theaters in the Atlanta area.

This suit was filed on the 13th day of June, 1968, in five counts. In Count One the plaintiff sues on the original contract of June 22, 1967. In Count Two it sues on the contract of June 22, 1967, as modified by the work sheet of February 3, 1968. In Count Three it sues on the work sheet of February 3, 1968 as a distinct contract. In Count Four it sues on the two formal contracts which were later made up from the work sheet. In Count Five it sues on the two contracts (of February 5, 1968) made up from the work sheets but with a prayer for reformation seeking deletion of the February 21st playing date.

The defendant denies that plaintiff had a contract, denies that it breached any contract if it existed, and also files six counterclaims. Counterclaim One alleges a breach of contract by the plaintiff based upon the writings of February 5th (made up from the work sheet of February 3rd), defendant's contention being that plaintiff violated the February 21st playing date contained in those typed agreements. In Counter-

**1284**

claims Two and Three defendant seeks to recover film rentals due by the plaintiff to the defendant on other pictures shown by the plaintiff at other locations. There is little, if any, dispute under the evidence that these amounts are due by the plaintiff to the defendant. Counterclaims Four, Five, and Six relating to similar claims for royalties on other pictures at other locations have already been decided in favor of the defendant on motions for a partial summary judgment.

■ In addition to the foregoing summary, the court adopts the specific findings of fact submitted by the plaintiff and numbered 1 through 50, as modified and renumbered by the court. Based on these findings the court concludes that the plaintiff did have a valid and binding contract with the defendant for the showing of "The Graduate"; that defendant's agent, Frew, did have authority to bind defendant to the change of terms made by the parties on February 3, 1968, he having been expressly delegated by Edele to obtain these concessions; that no playing dates were ever agreed upon or assigned for the showing of the picture; that the defendant breached its contract with the plaintiff by licensing "The Graduate" to a competitor; and that plaintiff is therefore entitled to recover of the defendant in accordance with Count Two of its complaint.

The question of damages to be awarded in this case has given the court a great deal of difficulty, involving, as it does, a claim for anticipated profits from three separate theaters, one of which was still under construction at the time the contract was breached.

■ After some agonizing the court concludes that for this uncompleted theater (the Coronet) the plaintiff cannot recover. The court might well reach this conclusion upon the theory that under Georgia law anticipated profits from a business not yet begun are never re-

coverable. *See* Kenny v. Collier, 79 Ga. 743, 747, 8 S.E. 58. But in this case the court does not have to reach the question whether such profits are ever recoverable. Instead, as one Georgia court has said:

> "We will not say that there is no case where the allowance of damages upon expected profits is inadmissible; but we are quite sure that this is not one of them; the gains were too remote and uncertain, depending upon a variety of contingencies, the failure of any one of which would subvert the whole computation." Coweta Falls Mfg. Co. v. Rogers, 19 Ga. 416.

Many cases have held that profits that would have been derived from a moving picture exhibition are too remote [1] and speculative and uncertain to be recovered, but the question is more one of evidence than of law. As Corbin says:

> " * * * [T]he term 'speculative and uncertain profits' is not really a classification of profits but, instead, a conclusion of the evidence they have introduced to prove that they would have been made if the defendant had not committed a breach of contract." Corbin on Contracts, § 1022, p. 139.

■ Here the evidence as to the profits which would have been earned at the Coronet is entirely inadequate. The theater was under construction. It was to be located in a remodeled store building. So far as appears, the public did not know of its existence or where it was. Nothing appears about its proposed facilities, parking or otherwise. Even conceding, as we must, that the popularity of the moving picture "The Graduate" was such as to attract substantial patronage and thereby produce some profit at any suitable theater, still it can be nothing but sheer guesswork as to what those profits would have been. Nor is this deficiency cured by the testimony of defendant's expert, since in the final analysis his guesswork is no better than that of the court. Finally, this

---

1. *See* cases cited in Corbin on Contracts, p. 154, § 1023, n. 97. *But compare* William Goldman Theaters v. Loew's, 69 F.Supp. 103, an antitrust case.

conclusion that the anticipated profits of the Coronet Theater are necessarily speculative and uncertain, whereas those of the other two theaters are predictable, is confirmed by the experience of the three theaters of plaintiff in this case. It is significant, for example, that plaintiff's two established theaters (the Miracle and the Cherokee), with a consistent record of profits in the past, continued to make fairly substantial profits even after the present breach, whereas the new and uncompleted theater (the Coronet) which was finally opened only one week after the breach, incurred very substantial losses for each week during cover interest at 7% per annum on the history is relevant, *see* Corbin on Contracts, § 1023, pp. 151–152. On the general question of the recovery of anticipated profits in Georgia, *see also* Ga. Code Ann. §§ 20–1406, 20–1407, 105–2008; Georgia R.R. v. Hayden, 71 Ga. 518, 523.

With respect to the two established theaters (the Cherokee and the Miracle) the court concludes that there is sufficient evidence to establish plaintiff's damages for at least a portion of the period for which damages are claimed. In the findings included in Appendix II filed herein, the amount of these damages, the exact period for which they are allowed, and the method of their computation is set forth in detail. Those findings are adopted as part of this opinion.

The court finds for the plaintiff on Counterclaim One because defendant has introduced no evidence on these counterclaims. The court finds for defendant on Counterclaims Two and Three as there was little real dispute concerning these counterclaims in the record. The court has already found for the defendant regarding Counterclaims Four, Five and Six on defendant's motion for summary judgment. These amounts may be set off against the recovery by the plaintiff herein allowed. It is further ordered that the plaintiff have and recover interest at 7% per annum on the net amount of its recovery regarding the Cherokee and the Miracle. The interest shall date from February 21, 1968 concerning plaintiff's recovery on the amount of Cherokee's damages. The interest shall date from April 10, 1968 concerning the plaintiff's recovery on the amount of the Miracle's damages.

The parties may submit a judgment in accordance herewith.

It is so ordered.