Michael D. TANZER and Deborah Tanzer, Plaintiffs,

v.

INTERNATIONAL GENERAL INDUSTRIES, INC., KLK Corporation, George Olmsted, Marshall M. Austin, Ervin F. Bickley, Jr., William L. Cobb, Harvey H. Fischer, Ned W. Heyward, B. Frank Taylor, Josef S. Tressler, and Kliklok Corporation, Defendants.

Court of Chancery of Delaware, New Castle.

Submitted Dec. 14, 1978.

Decided May 10, 1979.

Revised May 25, 1979.

Joseph A. Rosenthal, of Morris & Rosenthal, P. A., Wilmington, and Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiffs.

Charles S. Crompton, Jr., Robert K. Payson and James F. Burnett, of Potter, Anderson & Corroon, Wilmington, and Satterlee & Stephens, New York City, for defendants.

HARTNETT, Vice Chancellor.

This action arose out of the merger of defendant—KLK Corporation ("KLK") into defendant—Kliklok Corporation ("Kliklok"). At the time of the merger defendant—International General Industries, Inc. ("I.G.I.") owned 81% of Kliklok's outstanding common stock and all of KLK's outstanding stock. Plaintiffs (the Tanzers) were also owners of stock in Kliklok and sued in this Court to prevent the merger by preliminary injunction, alleging that the sole purpose of the merger was to serve the

interest of the parent, I.G.I. The Tanzers also sued the officers and directors of I.G.I. and sought to hold them liable for the allegedly improper merger.

The Court of Chancery (through then Chancellor Quillen) refused to enjoin the merger on the grounds that a reasonable probability of ultimate success had not been demonstrated by the Tanzers. The Court also declined to consider defendants' Motion For Summary Judgment on procedural grounds. The Chancellor did, however, anticipate the probability of ultimate judgment for defendants. For a more detailed recitation of the underlying facts see: *Tanzer v. Int'l. Gen. Ind., Inc.*, Del.Supr., 379 A.2d 1121 (1977). The Chancellor's decision was appealed to the Delaware Supreme Court. That Court affirmed the Chancellor in part and remanded for further proceedings by this Court consistent with the Opinion. *Tanzer v. Int'l. Gen. Ind., Inc.*, supra. In remanding the case for further proceedings, the Supreme Court upheld the Chancellor's finding that there was a valid business reason for the merger and therefore found that the merger complied with the rule of law announced in *Singer v. Magnavox Co.*, Del.Supr., 380 A.2d 969 (1977). The Supreme Court also found, however, that the Chancellor was in error in discussing the fairness of the merger to the minority stockholders only in terms of the price offered for the stock. As the Supreme Court said at 379 A.2d 1125:

This ruling, however, does not terminate the litigation because, given the fiduciary duty owed in any event by IGI to the minority stockholders of Kliklok, the latter are entitled to a fairness hearing under *Singer.* The Chancellor's opinion, announced at the preliminary injunction stage of this proceeding, discussed fairness only in terms of the price offered for the stock, but that was too restrictive. The test required by *Singer,* which applied the rule of *Sterling, (Sterling v. Mayflower Hotel Corp.,* Del.Supr., 93 A.2d 107, 1952), involves judicial scrutiny

for "entire fairness" as to all aspects of the transaction.[1]

After the remand of the case to this Court for further proceedings, cross motions for summary judgment were filed. Two primary issues are now before me. The first issue is whether this case can now be disposed of on the cross motions for summary judgment without trial. For the reasons to be discussed, I have held that it may. The second issue is whether the merger was intrinsically fair to the minority stockholders who were forced to give up their stock ownership for cash. After a view of the entire transaction, based on the record, I have held that the transaction was intrinsically fair to the minority stockholders.

## I. MOTIONS FOR SUMMARY JUDGMENT

It is with some trepidation that I consider the motions for summary judgment in view of the Supreme Court's observation that the minority stockholders (the Tanzers) are entitled to a fairness hearing. It would be easy to hold that a "fairness hearing" means a trial and thereby summarily deny the motions for summary judgment and order a trial. The posture of this case dictates, however, a more in depth analysis.

■ The procedural question presented by the motions, is whether there are really any disputed factual issues remaining in this case after the protracted discovery and the prior hearing. I think not. As will be seen from the discussion on fairness, hereafter, there are no disputed questions of fact but only legal questions as to fairness to the minority stockholders.

■ There is a heavy burden upon the movant in a motion for summary judgment. As stated in *Judah v. Delaware Trust Co.,* Del.Supr., 378 A.2d 624, 632 (1977):

. . . The facts must be viewed in the manner most favorable to the nonmoving party [cites] with all factual inferences taken against the moving party and in favor of the nonmoving party [cite] and the moving party has the burden of demonstrating that there is no material question of fact [cite].

A party opposing summary judgment, however, may not merely deny the factual allegations adduced by the movant. If the movant puts in the record facts which, if undenied, entitle him to summary judgment, the burden shifts to the defending party to dispute the facts by affidavit or proof of similar weight. *Hurtt v. Goleburn,* Del.Supr., 330 A.2d 134 (1974); Chancery Rule 56(e).[2] If the movant performs his initial job satisfactorily, then his opponent is obliged to bring in some evidence showing a dispute of material fact. *Phillips v. Del. P. & L. Co.,* Del.Supr., 216 A.2d 281 (1966). See also *Murphy v. Godwin,* Del.Super., 303 A.2d 668 (1973); *Epstein v. Celotex Corp.,* Del.Ch., 238 A.2d 843 (1968). In the present case the record consists of two days of testimony, taken by depositions, of the responsible officers of I.G.I., Kliklok, and Dillon Read (a consultant hired by I.G.I.), together with a multitude of documents produced by defendants, including a report by Dillon Read recommending the price to be paid to the minority stockholders. As will be discussed, this report is uncontroverted. The defendants have more than adequately introduced evidence to explain in great detail exactly what was done and why it was done. The Tanzers have had

---

1. For discussions of the holding see: "A Restatement of Corporate Freeze-Outs" by Brundy & Chirelstein, 87 Yale L.J. 1354 (1978); "Singer v. Magnavox Co.: Delaware Imposes Restrictions on Freezeout Mergers", 66 Cal. L.R. 118; Note: "Singer v. Magnavox and Cash Takeout Mergers", 64 Va.L.R. 1101 (1979); "Delaware Corporate Law—The Aftermath of Singer v. The Magnavox Company", 33 The Bus.L. 223 (1978); Note: "Delaware Chills Freezeouts", 3 Del.J.Corp.L. 426 (1978).

2. Rule 56(e) states in part:

. . . When a motion for summary judgment is made and supported as provided in this Rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

abundant opportunity to controvert these facts but have failed to dispute a single relevant fact. The Tanzers, therefore, have failed to meet the burden shifted to them of refuting the factual accuracy of the evidence in the record relied upon by defendants. *Bradford, Inc. v. Travelers Indemnity Co.,* Del.Super., 301 A.2d 519 (1972); *Palivoda v. Bruette,* Del.Super., 250 A.2d 808 (1969).

This does not end the matter, however. Since the facts set forth in the record are uncontroverted, they must be assumed to be true. Nevertheless a scrutiny of these facts by this Court is necessary to see if the transaction is entirely fair.

## II. BURDEN OF PROOF OF FAIRNESS

In the scrutiny of a corporate transaction by a court to determine if it is entirely fair to the minority stockholders, the threshold question is: Where does the burden of proof lie?

If the merger had not been ratified by a majority of the minority stockholders, there would be no question that the burden of proving intrinsic fairness would fall upon I.G.I. since it was the dominant stockholder who stood on both sides of the transaction and caused the merger to take place. *Singer v. Magnavox,* supra; *Harriman v. E. I. DuPont deNemours & Co.,* D.Del., 411 F.Supp. 133 (1975), and the Delaware cases cited at 411 F.Supp. 152. In the case before me, however, more than 50% of the shares owned by persons other than I.G.I. were voted in favor of the merger. Only 12% of the total outstanding shares and 6.3% of the shares owned by persons other than I.G.I. voted against the merger. Almost 90% of the votes cast by the minority stockholders were cast in favor of the merger.

The Delaware Supreme Court has not yet discussed whether stockholder ratification shifts the burden of proof in freeze-out merger cases where a majority stockholder stands on both sides of the transaction and therefore owes a fiduciary duty to the minority. In *Singer v. Magnavox,* supra, the Delaware Supreme Court imposed the in-trinsic fairness test in controlled mergers, but did not have before it the question of whether ratification by a majority of the minority stockholders shifts the burden of proof to the objecting stockholders.

The Tanzers, in arguing that ratification does not shift the burden of proof, rely on *David J. Greene & Co. v. Dunhill Int'l, Inc.,* Del.Ch., 249 A.2d 427 (1968). Defendants, on the other hand, cite *Gottlieb v. Heyden Chemical Corp.,* Del.Supr., 91 A.2d 57 (1952); *Beard v. Elster,* Del.Supr., 160 A.2d 731 (1960); *Saxe v. Brady,* Del.Ch., 184 A.2d 602 (1962); and *Michelson v. Duncan,* Del. Ch., 386 A.2d 1144 (1978) for the proposition that stockholder ratification freshens the atmosphere and shifts the burden of proof of fairness to the objecting stockholder. None of the cases cited by defendants, however, involved a merger of a controlled corporation.

It is not necessary for me to decide this issue in this case, however, since it is the law of this case—as determined by the Delaware Supreme Court—that the burden of proof is upon the defendants. As quoted previously, the Supreme Court has held in this case that "The test required . . . involves judicial scrutiny for 'entire fairness' as to all aspects of the transaction." The words "entire fairness" are synonymous with the words "intrinsic fairness". The intrinsic fairness test may be defined as a test which imposes the burden of persuasion on the proponents of the merger with careful scrutiny by the court. *Harriman v. E. I. DuPont deNemours & Co.,* supra; NATHAN & SHARIPO: "Legal Standards of Fairness of Merger Terms Under Delaware Law", 2 Del.J.Corp.L. 44 (1977). See also *David J. Greene & Co. v. Dunhill Int'l, Inc.,* supra, where Chancellor Duffy said: "When a Delaware court is called upon to determine whether a proposed merger between a parent corporation and a subsidiary which it controls (and which has minority stockholders) should be enjoined, fairness is the established criterion for judgment. That is the litmus test to which the transaction must be submitted." The converse to the intrinsic or entire fair-

ness test is, of course, the business judgment rule which places the burden of proof upon the objector. The Delaware Supreme Court by requiring judicial scrutiny for entire fairness has therefore held in this case that the burden of proof is upon the defendants and I am bound by that ruling.[3]

## III. THE TEST OF FAIRNESS

■ The ultimate issue therefore is: "Was the merger entirely fair as to all aspects of the transaction to the minority stockholders?" In one sense any merger, the end result of which is to cause the minority stockholders to be involuntarily divested of their investment, is unfair to the nonconsenting stockholders. But such mergers and the resulting freeze-out of the minority stockholders are authorized by 8 *Del.C.* § 251 and have been upheld on numerous occasions. As stated in *Singer v. Magnavox,* supra: "To state the obvious, under § 251 two (or more) Delaware corporations 'may merge into a single corporation.' Generally speaking, whether such a transaction is good or bad, enlightened or ill-advised, selfish or generous—these considerations are beside the point. Section 251 authorizes a merger and any judicial consideration of that kind of togetherness must begin from that premise."

Unfortunately, Delaware law gives only limited guidance as to how to scrutinize "entire fairness" other than in determining the burden of proof. *Tanzer v. Int'l. Gen. Ind., Inc.,* supra, cites *Singer v. Magnavox,* supra, and *Sterling v. Mayflower Hotel Corp.,* supra, as the fountainhead for the concept of entire fairness. In *Singer,* the Delaware Supreme Court said, at 380 A.2d 980:

> This is not to say, however, that merely because the Court finds that a cash-out merger was not made for the sole purpose of freezing out minority stockholders, all relief must be denied to the minority stockholders in a § 251 merger. On the

contrary, the fiduciary obligation of the majority to the minority stockholders remains and proof of a purpose, other than such freeze-out, without more, will not necessarily discharge it. In such case the Court will scrutinize the circumstances for compliance with the *Sterling* rule of "entire fairness" and, if it finds a violation thereof, will grant such relief as equity may require. Any statement in *Stauffer (Stauffer v. Standard Brands,* Del.Supr., 187 A.2d 78), inconsistent herewith is held inapplicable to a § 251 merger.

In *Singer,* Justice McNeilly, in a concurring opinion, stated that, in his opinion (but of course not the opinion of the Court), a complaint alleging a breach of fiduciary obligation by the majority stockholder in a freeze-out merger, shifts the burden to the majority stockholder to establish the fairness of the entire transaction as shown by the "business purpose, or economic necessity, desirability and feasibility involved, evidence of self-serving, manipulation, or overreaching, and all other relevant factors of intrinsic fairness or unfairness". In *Sterling,* the Delaware Supreme Court spoke to the point now at issue and quoted with approval Vice Chancellor Pearson's opinion in *Porges v. Vadsco Sales Corp.,* Del.Ch., 32 A.2d 148 (1943) at p. 151:

> To arrive at a judgment of the fairness of the merger, all of its terms must be considered.

In *Sterling,* the Supreme Court continued:

> As we have already held, net asset value is one of the factors to be considered in determining the fairness of a plan of merger. But the requirement that consideration be given to all relevant factors entering into the determination of value does not mean that any one factor is in every case important or that it must be given a definite weight in the evaluation. [cite] The relative importance of several

---

3. While it is clear that the business judgment rule places the burden upon objectors, the standard of conduct required by that rule is open to question. See ARSHT: "The Business Judgment Rule in Delaware and its Applicability to the Fiduciary Responsibility of Directors, Officers and Controlling Stockholders", Del.Corp. Law Seminar 2–15–79; 5 Del.J.Corp.L. —— (1979).

tests of value depends on the circumstances. Thus, in some cases net asset value may be quite important. [cite] But in the case at bar it is of much less importance than the factors analysed in the Haslam report. We are dealing here with corporations engaged in the hotel business, whose capital is invested largely in fixed assets. The shares of such corporations are worth, from the viewpoint of an investor, what they can earn and pay. A comparison of net asset values may have some weight, but it is of much less importance than demonstrated capacity of the corporation to earn money and pay dividends. In *Allied Chemical & Dye Corp. v. Steel and Tube Co. of America,* Del.Ch., 122 A. 142, Chancellor Wolcott, dealing with the relative importance of replacement costs and earning power as standards of value in connection with industrial property, expressed the view that earning power is by far the more important. [cite] In respect of earning power the superiority of Hilton stock is clearly shown. In these circumstances we deem the evidence adduced by defendants upon the issue of comparative net asset value to be sufficient to discharge whatever duty they were under in respect of the matter; and this notwithstanding the inconclusive nature of the "indicated values" arrived at by Haslam. 93 A.2d 115, 116.

In *David J. Greene & Co. v. Dunhill Int'l, Inc.,* supra, Chancellor Duffy stated:

When a Delaware court is called upon to determine whether a proposed merger between a parent corporation and a subsidiary which it controls (and which has minority stockholders) should be enjoined, fairness is the established criterion for judgment. That is the litmus test to which the transaction must be submitted. Thus in *Sterling v. Mayflower Hotel Corp.,* (cite) the Supreme Court said, in addressing itself to this inquiry:

'The principal question presented is whether the terms of a proposed merger of Mayflower Hotel Corporation * * * into its parent corporation, Hilton Hotels Corporation * * * are fair to the minority stockholders of Mayflower.'

The approach to be taken in resolving this question was formulated by the Court in the following way:

'Plaintiffs' principal contention here, . . . is that the terms of the merger are unfair to Mayflower's minority stockholders. Plaintiffs invoke the settled rule of law that Hilton as majority stockholder of Mayflower and the Hilton directors as its nominees occupy, in relation to the minority, a fiduciary position in dealing with Mayflower's property. Since they stand on both sides of the transaction, they bear the burden of establishing its entire fairness, and it must pass the test of careful scrutiny by the courts. *Keenan v. Eshleman,* 2 A.2d 904 (cite); *Gottlieb v. Heyden Chemical Corp.* [cite].'

\* \* \* \* \* \*

In focusing on what is meant by fair under these circumstances, Dunhill argues that the Court need only find that the plan is one that "disinterested men would find reasonable" and that it "has been worked out on the basis of an honest report submitted by competent disinterested appraisers on a sound valuation basis." If this means that the Court should not examine the Duff report and consider it (and its contents) along with all other affidavits in the record, then the argument is not sound. What is to be considered was stated precisely by Chancellor Seitz in *Sterling*:

"I conclude that all relevant value figures of both corporations may be examined and compared in order to arrive at a decision as to the fairness of the plan. Thus, while not determinative, nevertheless, the value of each corporation for various purposes, e. g., going concern value, book value, net asset value, market value, is pertinent to the issue presented." (89 A.2d at p. 867)

He then analyzed the report made by the independent specialist, and the affidavits, and the testimony. Compare *Porges,* in which the Court said, in language approved by the Supreme Court in *Sterling*:

" 'To arrive at a judgment of the fairness of the merger, all of its terms must be considered.' . . ." (93 A.2d at p. 114)

Writers have also suggested that the fairness of a freeze-out merger be tested by two separate concepts: fair dealing and fair price. 2 Del.J.Corp.L. 44, supra.

## IV. FACTS TO BE CONSIDERED IN THE FAIRNESS SCRUTINY

The uncontroverted facts are these: In 1961, all of the outstanding stock of Kliklok, a Delaware corporation, was acquired by Atlas General Industries, Inc., a predecessor corporation of Bradford Speed Packaging and Development Corp. ("Bradford"). In December, 1965, Bradford offered for public sale 270,000 shares (18% of the outstanding stock) of Kliklok's common stock at a price of $11.00 per share pursuant to a public underwriting registered under the Federal Securities Act of 1933. In 1971, Bradford changed its name to International General Industries, Inc. I.G.I. is a public corporation listed on the American Stock Exchange.

Beginning in early 1975, I.G.I. explored alternative plans for refinancing its indebtedness. For various reasons, investment bankers approached by I.G.I. encountered difficulty in placing its long term debt. In June 1975, a meeting was arranged between representatives of I.G.I. and Dillon, Read & Co., Inc. ("Dillon Read"), an investment banking firm, to discuss a possible long term, over-all, refinancing. There, for the first time, it was suggested to I.G.I. that a long term debt refinancing program would be facilitated if I.G.I. owned 100% of the capital stock of Kliklok rather than only 81%. As a result, I.G.I. and Kliklok retained Dillon Read to make a study and prepare a report with a recommendation as to the fair and equitable price that ought to be paid to the minority stockholders (i. e., stockholders other than I.G.I.) upon a merger. After an analysis of the company, including visits to Kliklok's plants, discussions with management, valuations of comparable publicly traded companies, review of Kliklok's financial statements, and consideration of other relevant factors, Dillon Read recommended that a price of $11.00 per share would be fair and equitable to the minority shareholders of Kliklok.

The price of $11.00 per share recommended in the Dillon Read report represented a premium of 29% over the closing market price of Kliklok common stock on September 24, 1975, the day prior to the merger study announcement, and a premium of 36% over the average price of such stock for the period of July 1 through September 24, 1975. In addition, the recommended price reflected a price earnings ratio of 6.7 times the actual 1974 earnings per share of $1.63, 7.5 times the 12 months' earnings per share for the 12-month period that ended June 30, 1975, 9.2 times the estimated earnings per share for the calendar year 1975, and 9.0 times the average earnings per share for the years 1971 through 1975. (The net income per share for the nine months ended September 30, 1975 was $0.93. Estimated net income per share for 1975 was $1.20.) as well as 99.5% of book value at June 30, 1975. The recommended price of $11.00 per share also exceeded the highest price of Kliklok common stock recorded on the American Stock Exchange during the years 1973, 1974 and 1975.

After considering the Dillon Read report and other factors, the Board of Directors of I.G.I. caused KLK to be organized as a wholly-owned subsidiary of I.G.I. on September 30, 1975. Thereafter, the Board of Directors of Kliklok and KLK approved an Agreement and Plan of Merger between Kliklok and KLK and directed that the Agreement be submitted to the stockholders of each company for approval. Under the terms of the merger agreement each minority common shareholder of Kliklok would receive $11.00 per share in cash and all of the stock owned by I.G.I. would be converted into 1,000 shares of common stock of Kliklok, with the result that I.G.I. would become the sole stockholder of Kliklok. In order to finance the payments to be made to the minority shareholders of Klik-

lok and the other incidental expenses of the proposed merger, KLK and I.G.I. arranged for a loan of $4,000,000 from Chemical Bank to KLK with a guarantee by I.G.I. In addition, I.G.I. agreed to contribute to the capital of KLK a $4,000,000 note of I.G.I., fully subordinated to all indebtedness of I.G.I. to Chemical Bank, with payment provisions substantially the same as the loan from Chemical Bank to KLK.

In the Proxy Statement forwarded to the stockholders of Kliklok for the special meeting of stockholders to be held on December 14, 1974, the stockholders were advised that "[t]he principal reason for the merger is to facilitate future long term debt financing by I.G.I.". The stockholders were also advised that I.G.I. owned 100% of the stock of KLK, and 81% of the stock of Kliklok; that I.G.I. had advised the managements of both companies that it intended to vote its shares in favor of approval of the merger agreement; and accordingly, that approval of the merger was assured. The Proxy Statement set forth detailed information about Kliklok's business, including financial statements for the preceding five years. The proxy material also advised the stockholders that appraisal rights were available to those minority stockholders who dissented from the merger pursuant to 8 *Del.C.* § 262.[4]

The special meeting of stockholders of Kliklok was held as scheduled and the merger was approved by the affirmative vote of 1,514,912 shares of common stock (including 1,356,607 shares owned by I.G.I.) and 530 shares of preferred stock. Of the 313,377 shares of common stock owned by Kliklok's minority shareholders, 184,284 shares were represented at the meeting and 158,305 shares voted in favor of the merger, with 19,860 voting against. Thus, over 50% of the minority shares outstanding were voted in favor of the merger, and almost 90% of the minority shareholders who actually voted approved the transaction.

### V. SCRUTINY OF THE TRANSACTION

For the scrutiny by the Court of the uncontroverted facts underlying the entire transaction, to see if the transaction is intrinsically fair to the minority stockholders, the parties have suggested eight criteria of fairness. They are discussed seriatum.

### 1. *THE PURPOSE OF THE MERGER*

Chancellor Quillen, in the initial holding in this case, found that "I.G.I. has a legitimate and compelling business reason to be the sole owner of Kliklok, and the Supreme Court agreed, holding that " . . . I.G.I. has established a bona fide purpose for the Kliklok merger." *Tanzer v. Int'l. Gen. Ind., Inc.,* supra. This finding is therefore conclusive.

### 2. *ALTERNATIVES TO A CASH–OUT MERGER*

The Tanzers contend that the defendants have failed to show why it was necessary for the majority stockholders to "cash-out" the minority stockholders by causing the merger and offering the minority stockholders only cash or reliance on the statutory appraisal proceeding. For example, they note that a merger of I.G.I. and Kliklok by an exchanging of stock would have eliminated the Kliklok minority but would have also enabled the minority to take advantage pro rata of the benefits conferred upon I.G.I. from the merger or elimination of the minority stockholders. The Tanzers also note that a sale of Kliklok's assets for I.G.I. stock with a simultaneous liquidation of Kliklok would have accomplished the same result without the forcing of the minority stockholders to become immediately responsible for a gain or loss for federal income tax purposes.

The defendants correctly point out, however, that if I.G.I. had proposed an alternative to a cash-out merger, the effect would have been to deprive the Kliklok minority of any right to an appraisal under 8 *Del.C.* § 262, since appraisal rights are not available on a sale of assets. *Hariton v. ARCO Electronics, Inc.,* Del.Ch., 182 A.2d 22 (1962), *aff'd.,* Del.Supr., 188 A.2d 123 (1963);

4. 8 *Del.C.* § 262 is set forth in *Singer v. Magnavox,* 380 A.2d at 974 fn. 4.

nor are they available for shares of stock which are listed on a national securities exchange, and which are exchanged upon a merger for shares of stock listed on a national securities exchange. 8 *Del.C.* § 262. Both Kliklok and I.G.I. are listed on the American Stock Exchange.

■ It is obvious that securities of I.G.I. might have been more attractive than cash to some stockholders of Kliklok; there is nothing in the record to indicate, however, that if such securities had been offered they would have had a value equivalent to $11 in cash, the premium price offered to the cashed-out stockholders. Undoubtedly, many stockholders would have preferred cash at $11 per share for each share of Kliklok in lieu of stock in I.G.I. which was readily available to the public for a lesser sum. Forcing the minority stockholders to take stock in the surviving corporation might have been just as unfair to them as requiring them to take the cash offered for their stock. Not all mergers turn out well, the merger of the Pennsylvania Railroad and The New York Central Railroad being but one notorious example. To force a stockholder to accept an investment which he does not want may be just as unfair as it is to force him to divest himself of an investment he is happy with by requiring him to turn in his shares in a cash-out merger. Fairness is relative.

It must also be noted that the fairness of the price must usually be, at least initially, judged at the time just preceding the merger since the issue usually arises in a proceeding to enjoin a merger. The value to the "cashed-out" stockholder of the merger is at that time and for a long time thereafter pure speculation. The remoteness and the uncertainty of the amount of damages has been traditional reason to deny relief. See DOBBS: *Handbook on the Law of Remedies* (West Pub. Co.) § 3.3; *Eastern Federal Corp. v. Avco-Embassy Pictures, Inc.,* U.S.D.C.-Ga., 326 F.Supp. 1280 (1971).

Needless to say, it may be more fair, in appropriate cases, to give the minority stockholders an option to receive stock in the surviving corporation in lieu of cash, if such stock is available. The drafters of future merger transactions may wish to give careful consideration to providing such an option, if feasible under all the circumstances.

### 3. *INDEPENDENT RECOMMENDATIONS AS TO FAIRNESS OF THE PRICE*

Defendants argue that, after a careful study and analysis of Kliklok, Dillon Read's recommendation of $11 per share represented a substantial "premium" over the average market price of Kliklok during the two years preceding the announcement of the merger, and 9.0 times the average earnings per share of the years 1971 through 1975. The Tanzers have offered no evidence as to the unfairness of the merger price. The defendants have attempted to show the fairness of the price by the testimony of Mr. Durkin, a managing director of Dillon Read, Mr. McNaughton, a Vice President of I.G.I., and Mr. Santosus, an Executive Vice President of Kliklok, and by the introduction of documentary evidence including the Dillon Read report. It is clear that defendants have shown that the price paid to the minority shareholders in connection with the subject merger was at least prima facie fair and that the Tanzers have presented no contrary evidence.

■ The Tanzers also note that Dillon Read's "independence" from I.G.I. was questioned by the Securities and Exchange Commission, and that Dillon Read had a $200,000 fee at stake for assisting I.G.I. in its long-term debt financing program which depended upon the outcome of the merger. The Tanzers also call attention to the fact that there was not a single person speaking for the minority Kliklok stockholders. It cannot be said, however, as a matter of law, that this lack of independent representation of the Kliklok minority, or the failure of defendants to act on the S.E.C.'s suggestion to obtain a second appraisal, necessarily caused the minority to not be treated fairly.

### 4. ADEQUATE NOTICE TO MINORITY SHAREHOLDERS

Kliklok mailed a 34-page Proxy Statement to its minority shareholders 30 days prior to the special meeting at which the vote on the merger was to be taken. The Proxy Statement, prepared pursuant to the Proxy Rules of the Securities and Exchange Commission, provided detailed information about the merger, the rights of the dissenting stockholders, the business transacted by Kliklok and financial statements for Kliklok for the preceding five years. It is clear that the Tanzers have never challenged the completeness or accuracy of the Proxy Statement and Chancellor Quillen previously found that "insofar as the issues in this case are concerned, there are no disclosure problems resulting from the Proxy Statement."

### 5. POSSIBILITY OF PUBLIC ISSUE AT A HIGH PRICE FOLLOWED BY A MERGER AT A LOW PRICE

As defendants concede, one of the circumstances of a "going private" merger is that it may permit a majority stockholder to obtain funds through a public offering of stock at a high price and thereafter, following a decrease in the market price of the stock, to repurchase the minority shares at a significantly lower price than the public offering. See *Marshel v. A.F.W. Fabric Corp.*, 533 F.2d 1277, vacated, 429 U.S. 881, 97 S.Ct. 228, 50 L.Ed.2d 162 (1976). In that case the Supreme Court vacated the judgment of the Second Circuit and remanded the case with instructions to consider whether it was moot. In the present case, however, there was a public issue of 270,000 shares at a price of $11.00 per share in 1965. During the years 1968 through 1973, Kliklok paid an annual cash dividend of $.50 per share and in 1974 and 1975 Kliklok paid cash dividends of $.60 per share. The merger price of $11.00 per share, as recommended by Dillon Read, represented a premium of 29% over the closing price of the stock on the day prior to the merger study announcement and, of course, the merger price was the same as the 1969 public offering price.

The Tanzers agree that their plight might have been worse; yet they urge that fairness is not bestowed *ipso facto* upon the merger in question by the hypothetical argument that the state of affairs existing at the time of this merger is better than that which existed in some other "going private" cases.

They urge that it is still basically unfair to acquire 100% of a much better company in 1975 for the same price offered in 1965. The Tanzers argue that Kliklok experienced the same depression in the stock market that visited the securities world since 1971 and which culminated in 1974 in a market decline unrivaled since the Great Depression of the Thirties. They claim that at the time of the merger Kliklok "was starting to pull out of the market doldrums, but the merger effectively chilled that progression." The Tanzers therefore argue that summary judgment may not be granted because a material issue of fact is their assertion that the 1975 merger price was unfair since it was identical to the price at which Kliklok shares were offered to the public in 1965.

The Tanzers are in error, however, in characterizing this contention as an "issue of fact." There is no dispute as to what was the amount of the merger price or the 1965 offering price. It is clear that the 1965 offering price has no relevance to the fairness of the merger price in 1975. By analogy, to appraisal proceedings, the Court must look only at prices at or shortly prior to the merger in fixing a market value. *Levin v. Midland-Ross Corp.*, Del.Ch., 194 A.2d 50, 53–54 (1963) (average of prices on last trading day preceding announcement of merger); *In re: Olivetti Underwood Corp.*, Del.Ch., 246 A.2d 800 (1968) (prices for five-month period prior to tender offer). The market price for Kliklok shares 10 years before the merger simply has no probative value in establishing a fair price for such stock in 1975. If anything, the 1965 offering price would indicate a sharp decrease in the market value of shares of Kliklok over the ten-year period. The issuance of 270,-

000 shares at $11 in 1965 clearly evidences a market value at that price at the time. On the day prior to the announcement of the merger, however, the closing price of the stock was only $9.50. Nevertheless, the Kliklok minority was paid a substantial premium over market in connection with the merger.

### 6. USE OF KLIKLOK'S FUNDS TO FINANCE THE MERGER

Mergers have also been criticized where funds of the publicly held company are used to finance the merger. See *Marshel v. A.F.W. Fabric Corp.*, supra. In the instant case, KLK borrowed $4,000,000 from Chemical Bank, guaranteed by I.G.I., in order to finance the payments to the minority shareholders and pay the other expenses incidental to the merger. I.G.I. also gave to KLK, as a capital contribution, a $4,000,000 note which was fully subordinated to the indebtedness of I.G.I. to Chemical Bank. Defendants claim, therefore, that Kliklok provided no funds or other consideration for the transaction. The Tanzers contend, however, that Kliklok funds were used to finance the merger. While technically KLK borrowed $4,000,000 from Chemical Bank, guaranteed by I.G.I., in order to finance the payments to the minority stockholders, the fact is that KLK disappeared as a result of the merger and therefore Kliklok became obligated to pay the $4,000,000 back to Chemical Bank. Defendants answer the Tanzers by claiming that Kliklok's obligation to repay the loan after the merger in no way worked to the detriment of the former minority stockholders. This was recognized by Chancellor Quillen in his prior decision, wherein he stated:

> The fact that Kliklok will pay the interest on a loan used to purchase the minority shares when I.G.I. is the sole owner does not inject a detriment to its corporate purpose.

Chancellor Quillen's language could well be expanded to read: "The fact that Kliklok will pay the interest on a loan used to purchase the minority shares when I.G.I. is the sole owner does not inject a detriment

to its corporate purpose, nor indicate unfairness to the minority stockholders."

### 7. EXISTENCE OF APPRAISAL RIGHTS AVAILABLE TO MINORITY SHAREHOLDERS

Pursuant to 8 *Del.C.* § 262, any minority shareholder of Kliklok who was dissatisfied with the price paid upon the merger, as recommended by Dillon Read, had the option of seeking an appraisal of his shares in the Court of Chancery. This right was spelled out in detail in the Proxy Statement; yet no minority shareholder of Kliklok has instituted an appraisal proceeding to date.

■ The Tanzers correctly note that *Singer* rejected the motion that a majority stockholders' fiduciary obligations to minority stockholders of a subsidiary can be met by simply relegating the minority to a statutory appraisal proceeding. 380 A.2d at 977. The availability of appraisal rights should be taken into account, however, as one factor in assessing whether a transaction between a parent corporation and its subsidiary's minority stockholders is entirely fair, even though its existence alone is insufficient to establish that the transaction was fair.

### 8. I.G.I.'S APPROPRIATION OF THE BENEFITS FROM THE MERGER

A serious challenge to the fairness of the transaction is the Tanzers' claim that none of the benefits flowing to I.G.I. from the merger was taken into account in setting the price to be paid to the Kliklok minority. Mr. Durkin of Dillon Read, I.G.I.'s financial advisor, testified:

Q. Did you in the course of your work on the proposed merger take into account the benefit that I.G.I. would derive from the merger's facilitating its long-term debt financing in arriving at a price for the minority stockholders of Kliklok?

A. Certainly this was something that we were aware of, but I don't think it is an important factor in determining the price to be offered to the public shareholders of Kliklok.

Q. So is it fair to say that the answer to my question is no?

A. Yes.

Invoking the intrinsic fairness standards rather than the business judgment rule, as the Supreme Court has mandated in this case, the Tanzers conclude that the defendants' motion for summary judgment must be denied but that their motion, which is based on the claim that I.G.I. paid nothing to the Kliklok minority for the benefits flowing to I.G.I. from the merger, must be granted. They urge that the intrinsic fairness standards dictate that I.G.I. cannot appropriate to itself and its stockholders 100% of the merger benefits to the exclusion of the Kliklok minority. This proposition is expounded by Professors Brudney and Chirelstein in "Fair Shares in Corporation Mergers and Takeovers", 88 Harvard L.R. 297 (1974) 318–320, an article which has received much notice since it was first published. The authors urge that, if a merger transaction results in a benefit by way of saving (called "the synergistic effect"), the saving must be shared on some basis between all the entities and cannot be allocated solely to either—at least in the absence of an agreement to the contrary. Defendants point out, however, that the minority shared the benefits of the merger presently before the Court for scrutiny because they were offered a premium for their stock. Indeed, there can be no question that a very substantial premium was paid by I.G.I. for the purchase of the Kliklok minority stock, which is cited in the Dillon Read appraisal report as a premium of 29% over the market value preceding the date of the report and a price which was higher than the market price had been since 1972.

Defendants concede that at no point in the proceeding nor in the proxy material has it ever been denied or concealed that the merger might be of value to I.G.I. Indeed, if the merger was not expected to be of some value to I.G.I., there would be no purpose for I.G.I. to effect the transaction. The Delaware Supreme Court recognized in this case that if the purpose of the merger was bona fide " . . . I.G.I. need not sacrifice its own interest in dealing with a subsidiary." 379 A.2d at 1124.

▪ The allocation of part of the value of the synergistic effect to the minority being forced out has been approved in but one case, as far as I am aware. In *Mills v. Electric Auto-Lite Co.,* 7th Cir. 552 F.2d 1239 (1977); *cert. den.* 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279, 434 U.S. 1002, 98 S.Ct. 649, 54 L.Ed.2d 499, the Court approved the principle but concluded that the minority stockholders received a premium in excess of the value of the synergistic effect. The compulsory allocation of the value of the synergistic effect to the frozen-out minority stockholders in a merger assumes that in all mergers there will be a value to the surviving corporation of the merger itself. This ignores the fact that many mergers have not turned out that way. Often the surviving corporation is not stronger or more profitable than its parts.

The greatest difficulty with adopting a general rule, applicable to all cases, requiring a value to be placed on the synergistic effect of a merger is the highly speculative nature of the effect. The probable existence of the synergistic effect would usually have to be determined before the merger where an injunction against the merger was sought. As a matter of practicality, it is usually almost impossible to ascertain the financial benefits, if any, which will occur solely because of the merger. The fact that a merger would not take place if the authors of the merger did not think it had merit does not establish that it will be profitable.

In the present case, the Tanzers belatedly urged, at oral argument, that the value of the synergistic effect was easily determinable in this case, but they introduced no evidence by affidavit or otherwise to show its value.

▪ The only practical time to consider the synergistic effect, if any, would be during an appraisal pursuant to 8 *Del.C.* § 262. Unfortunately, for the Tanzers, the Delaware appraisal statute presently precludes its consideration. It is not for this Court,

however, to substitute its judgment for that of the General Assembly. If the synergistic effect is to be considered by this Court in an appraisal proceeding, it should be legislatively mandated. The failure of a dominant stockholder to recognize the possible synergistic effect of a merger in arriving at a price to be offered for the shares of the stockholders being frozen out, is not therefore valid grounds to challenge the merger.

Even if a possible synergistic effect should have been recognized and given value in this case, the Tanzers have introduced no evidence that the 29% premium offered by I.G.I. for the Kliklok stock owned by the minority stockholders does not adequately compensate the minority stockholders for such possible synergistic effect.

## VI. CONCLUSION

Commentators have discussed other criteria to be used in judging the fairness of a merger to the minority stockholders. See "Delaware Chills Freeze-Outs", 3 Del.J. Corp.L. 426 (1978) and the articles cited in footnote 1. None of the other suggested criteria are appropriate to the facts in this case, however.

■ It is clear from a review of the entire transaction that defendants have sustained their burden of showing that the entire transaction, considering all the facts and circumstances, was intrinsically fair to the minority stockholders, especially since defendants have shown that there was a valid business purpose for the merger, that a majority of the minority stockholders approved the merger, and that the forced-out stockholders were offered a 29% premium for their shares. The Tanzers have offered no evidence that the premium does not adequately compensate the minority stockholders nor have they adduced any other evidence to refute the showing of fairness made by the defendants.

The motion for summary judgment by the Tanzers (the plaintiffs) is denied. The motion for summary judgment by the defendants is granted.

So ordered.