# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JOHN J. CAIN, JR., JANE L. CAIN, )
DAVID PAPE, MELISSA PAPE, )
CHARLES MOORE, SR., JOHN )
DILLON, MARY E. GRANGER, )
JOSEPH W. AYRES, PAUL BRASURE, )
NELLIE BRASURE, JULIE A. )
CUMMINGS, CAROL BUCHLER, )
GARY C. MEIKLEJOHN, ANNA G. )
MEIKLEJOHN, JOHN L. )
MEIKLEJOHN, RICK EVANS, )
ROBERT C. ACKERSON, )
LIONEL F. WEEKS, ROBERT D. )
SIKES, SR., DIANE R. HUBER, and )
BATSON CREEK ESTATES )
COMMUNITY ASSOCIATION, INC., )
 )
          Plaintiffs )
 )
     v. ) C.A. No. 2019-0077-SG
 )
SUSSEX COUNTY COUNCIL, )
ANTHONY CRIVELLA, and OA )
OAKS, LLC, )
 )
          Defendants. )

## MEMORANDUM OPINION

Date Submitted: January 2, 2020
Date Decided: May 4, 2020

Robert V. Witsil, Jr., of ROBERT V. WITSIL, JR., P.A., Georgetown, Delaware, *Attorney for Plaintiffs*.

David N. Rutt, of MOORE & RUTT, P.A., Georgetown, Delaware, *Attorney for Defendant Sussex County Council*.

Richard A. Forsten and Pamela J. Scott, of SAUL EWING ARNSTEIN & LEHR LLP, Wilmington, Delaware, *Attorneys for Defendants Anthony Crivella and OA Oaks, LLC*.

GLASSCOCK, Vice Chancellor

This Memorandum Opinion resolves a challenge to a Sussex County Council (the "Council") decision rezoning a parcel of real property. Until the rezoning, the parcel was designated AR-1 and is mostly tillable land. It is bounded by the Batson Branch of Bearhole Creek, at the headwaters of Dirickson Creek. The property is just north-west of the now-developed area along the eastern portions of State Routes 20 and 54, and is located a few miles by road from Fenwick Island.[1] The rezoning is necessary to the purpose of the parcel's owners: the creation of an apartment-housing complex. Those of us growing up in eastern Sussex County in the 1960s and 70s would have been surprised at the idea that someone would want to build an apartment building in the Roxanna-Bayard area of Baltimore Hundred, let alone that opposition to such a construction would become a matter for this Court. Yet here we are.

The Plaintiffs are property owners in the general neighborhood of the parcel in question. They make two principal arguments that the ordinance should be struck. First, per Plaintiffs, the rezoning is impermissible as incompatible with the Sussex County Comprehensive Development Plan. Second, that the ordinance was enacted arbitrary and capriciously.[2] I note that the Council is a legislative body, and its ordinances are entitled to a presumption of validity. Accordingly, it is not my role

---

[1] The record is replete with references to the proximity of the parcel to development and the nearby beach; I also take judicial notice of the location.
[2] The Plaintiffs also argue that the ordinance is the result of impermissible spot or contract zoning.

to substitute my judgment for that of the Council. The Council is bound to comply with the Comprehensive Development Plan in zoning matters—where a rezoning is challenged on that basis my role is to ensure that the Council made a determination of compliance based upon substantial evidence. Where a decision of the Council is said to result from caprice, I must limit my review to a determination of whether the action taken resulted from a reasoned consideration of the record. Should I find these standards fulfilled, I must uphold the ordinance. Again, respect for notions of separation of powers dictate that I not substitute my judgment, or my belief as to the best outcome, for that of the legally-compliant and deliberative acts of the Council.

The Plaintiffs seek a declaratory judgment that the ordinance is void, and to enjoin the current owner of the property and the proposed developer (along with the Council, the Defendants here) from developing the property. The matter is before me on Cross-Motions for Summary Judgment. Here, I find, the ordinance in question passes the limited review before me. Accordingly, the Defendants are entitled to a judgment. My reasoning follows.

# I. BACKGROUND[3]

## A. The Property and the Parties

The parcel of land that is the focus of this Action is a 14.8455 acre parcel with a posted address of 36161 Zion Church Road, Frankford, Delaware 19945 (the "Property").[4] The Property is Sussex County Tax Map #533-11.0-82.00.[5]

The Plaintiffs are twenty individuals—and one incorporated community association—who are owners of land located adjacent or proximate to the Property.[6]

Defendant Council is a political subdivision of the State of Delaware and the governing body of Sussex County, Delaware.[7]

Defendant Anthony Crivella is an individual and the owner of the Property.[8]

Defendant OA Oaks, LLC ("OA Oaks") is the applicant for the proposed change of zone for the Property and the proposed developer of the Property.[9]

---

[3] The facts are primarily drawn from exhibits submitted by the Plaintiffs and the Defendants in support of their respective Motions for Summary Judgment. I cite to the Plaintiffs' exhibits as "PX __, at [page]" and Defendants' exhibits as "DX __, at [page]." I also cite to the Plaintiffs' Verified Amended Complaint, D.I. 6 ("Am. Compl"), where necessary.

[4] PX 1, at 1. I note that while the postal address is Frankford, the Property is in rural Baltimore Hundred, just east of Bayard and west of Little Assawoman Bay. It is physically closer to the beach resorts of Bethany Beach and Fenwick Island than to Frankford.

[5] *Id.*

[6] Am. Compl., ¶ 1.

[7] *Id.* ¶ 4.

[8] PX 1, at 1.

[9] *Id.*; PX 15, at 1.

*B. PLUS Application*

On October 5, 2017, OA Oaks and Crivella submitted a Preliminary Land Use Service ("PLUS") application to the Delaware Office of State Planning Coordination.[10] Under 29 *Del. C.* Ch. 92, a proposed rezoning, identified in the PLUS application, is reviewed in the first instance by the Office of State Planning Coordination, a public meeting is held, and the Office of State Planning Coordination must "furnish to the applicant and the local jurisdiction a written compilation of all comments received at the meeting."[11]

The PLUS application for the Property identified the then-present zoning of the Property as AR-1 and the proposed zoning as HR-1.[12] The proposed use identified is for a residential apartment complex with 178 units and a clubhouse.[13] The PLUS application identifies 4.90 forested acres, of which .30 acres would be

---

[10] DX G. The PLUS application identifies an entity other than OA Oaks, Ocean Atlantic Communities, LLC, as the developer, but neither party disputes that OA Oaks submitted the PLUS application. *See* Pls.' Opening Br. in Support of their Cross-Mot. for Summ. J. ("Pls. Opening Br."), at 5; Defs.' OA Oaks, LLC's and Anthony Crivella's Answering Br. in Response to Pls.' Mot. for Summ. J. and Opening Br. in Support of Defs.' Cross-Mot for Summ. J ("Defs.' Answ./Opening Br."), at 5. Therefore, for purposes of the Cross-Motions for Summary Judgment I assume that OA Oaks is the developer on the PLUS application. I also note that the Council has joined the briefs of the other Defendants and has not submitted briefs of its own. *See* Letter, D.I. 32.

[11] *See* 29 *Del. C.* § 9204.

[12] DX G, at 2. The Sussex County Code defines AR-1 as an "Agricultural Residential District" and HR-1 and a "High-Density Residential District." Sussex Cty. C. § 115-5.

[13] DX G, at 2.

4

removed, and 2.1221 acres of non-tidal wetlands, but notes that the wetlands would not be directly impacted.[14]

The Office of State Planning Coordination released its comment letter in response to the PLUS application on November 27, 2017 (the "Comment Letter").[15] The Comment Letter notes that the Property is "located in Investment Level 3 according to *Strategies for State Policies and Spending*" and that Investment Level 3 "reflects areas where growth is anticipated . . . in the longer term future."[16] The Comment Letter "encourage[s] [the parties] to design the site with respect for the environmental features which are present."[17]

Among comments from other agencies, the Delaware State Housing Authority ("DSHA") supported the rezoning in the Comment Letter. DSHA noted that the Property "is in close proximity to the many services, markets, and employment opportunities available in the coastal resort area – where there is a severe lack of housing."[18] DSHA continued that in assessing maps based on data such as school performance and racially/ethnically concentrated areas of poverty, it determined the Property is in "an 'Area of Opportunity' where environmental conditions and resources exist that are conducive to helping residents achieve positive life

---

[14] *Id.*
[15] DX H.
[16] *Id.* at 1.
[17] *Id.*
[18] *Id.* at 15.

outcomes. These areas tend to be strong, high-value markets that contain little or no affordable housing."[19] Finally, DSHA noted that due to a "significant market shift" it is "*critical* that communities move away from large lot single family-detached housing and *proactively* provide a variety of housing options to meet market demand."[20]

### C. Planning and Zoning Commission Review

On May 4, 2018, OA Oaks and Crivella submitted their application for a zoning amendment for the Property to the Sussex County Planning and Zoning Commission (the "Zoning Commission") under file #CZ1858 (the "Application").[21] The Zoning Commission, established under 9 *Del. C.* Ch. 68, was tasked with issuing a non-binding recommendation on the proposed zoning change to the Council. In other words, the role of the Zoning Commission is informative; its recommendations do not bind the elected members of the Council in considering rezoning applications.[22]

---

[19] *Id.* at 15–16.

[20] *Id.* at 16 (emphasis in original). DSHA noted that baby boomers are "looking to downsize into something more manageable" and consequently "a large amount of suburban homes [will] be placed on the market" combined with a "*decline* in households in age ranges that typically seek large homes." *Id.*

[21] PX 1. The proposed zoning in this application is HR-1 – RPC, rather than simply HR-1—under the Sussex County Code, the RPC designation allows for certain specifications, such as smaller minimum lot area and width. *See* Sussex Cty. C. Ch. 115, Art. XVI.

[22] *See* Sussex Cty. C. § 115-216.

The Sussex County Planning and Zoning Director submitted a staff analysis of the Application to the Zoning Commission for its review prior to the October 11, 2018 Zoning Commission Meeting.[23] The analysis noted that the 2008 Sussex County Comprehensive Plan Update (the "Comprehensive Plan") indicates that the Property is designated an Environmentally Sensitive Developing Area ("ESDA").[24] Per the analysis, the ESDA designation "recognizes that a range of housing types should be permitted including single family, townhouses, and multi-family. . . ."[25] The analysis identifies the zoning of the properties to the south (GR and B-1), the east (AR-1 and B-1), the west (AR-1 and C-1), and that there is a conditional use for an event venue in the area.[26] The analysis concludes that "[b]ased on the analysis of the land use, surrounding zoning and uses, the Change of Zone to allow from AR-1 . . . to HR-1 – RPC . . . could be considered consistent with the land use; however, it would be considered inconsistent with the area zoning and uses."[27]

Additionally, the Sussex County Community Development & Housing Office ("CD&H") submitted comments to the Zoning Commission at the Zoning Commission's request.[28] CD&H specifically commented on conditions attached to thirty-six of the 178 proposed units, targeting eligible tenants earning 70% of the

---

[23] PX 7.
[24] *Id.* at 1.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] PX 6.

Area Median Income, and discussed further, *infra*.[29]  CD&H noted that the project *is not* part of a County-administered affordable housing program, and that consequently, CD&H viewed the Application as "solely a land use decision."[30] CD&H ultimately offered replacement language for the proposed condition regarding an examination by an independent certified public accountant to ensure the conditions related to the income of certain tenants are followed, but stated that its own role in the project "should be limited" and that CD&H "does not have the staff or capacity to administer projects outside of the County programs . . . ."[31]

The Zoning Commission held a meeting on October 11, 2018 at which it discussed the Application for the zoning change.[32]  Representatives from the Delaware Restaurant Association and the Community Development for Housing Alliance Delaware spoke in favor of the zoning change, with one opining that "there is an affordable housing crisis" in Sussex County.[33]  A number of individuals, including a number of the Plaintiffs here, spoke out against the zoning change.[34]  The Zoning Commission "discussed" the Application, deferred action, and kept the record open in order to allow time for the staff to solicit comments.[35]

---

[29] I note that the proposed language purported to be in the Application is not in the record.
[30] PX 6, at 1.
[31] *Id.*
[32] PX 8, at 13.
[33] *Id.* at 18.
[34] *Id.* at 19.
[35] *Id.*

8

At a subsequent meeting on November 29, 2018 the Zoning Commission again discussed the Application.[36] A member of the Zoning Commission remarked on certain features of the proposed development and the surrounding area. For instance, he noted that "housing can be unaffordable for a lot of the workforce" in eastern Sussex County forcing long commutes and increased traffic and that this development "will provide affordable housing to Sussex County residents with low to moderate income levels who are a large part of the workforce in eastern Sussex County."[37]

A condition proposed in the the Application was discussed by the Zoning Commission, under which 36 of the units would be "Restricted Units" available to low and moderate income residents who qualify for workforce housing.[38] The restriction was to last for 30 years and required the Restricted Units to be "rented to tenants with gross household incomes equal to or less than 70% of the area median income for Sussex County ('Qualifying Tenants') . . . ."[39] "During lease-up and for a period of 2 years, [OA Oaks] must actively seek to lease available units to Qualifying Tenants at a rate equal to or greater than the ratio of Restricted Units to market rate units."[40] However, OA Oaks would not be prohibited from leasing

---

[36] PX 15, at 1.
[37] *Id.* at 2.
[38] *Id.* at 3.
[39] *Id.*
[40] *Id.*

9

Restricted Units to non-Qualifying Tenants when less than 36 Restricted Units are leased as long as any vacant units are first offered to Qualifying Tenants.[41] The Restricted Units must "be fully integrated into the community and shall not be substantially different in external or internal appearance and fit-out from market rate units."[42]

The Zoning Commission voted against the proposed zoning change 3-2, and the minutes of the November 29, 2018 meeting note that is "equivalent to disapproval" of the Application.[43]

### D. Sussex County Council Proceedings and the Ordinance

In between the Zoning Commission's initial hearing on the Application and its disapproval, on November 13, 2018, the Council held a meeting where it considered the proposed ordinance implementing the rezoning (the "Proposed Ordinance").[44] It was noted that the Council had received almost two hundred letters in opposition to the rezoning and two letters in support.[45] Most of the letters in opposition "referenced concerns with traffic, character of the area, noise from the proposed use, lighting from the proposed building, concerns with storm water management and drainage and wildlife impacts."[46] An attorney representing OA

---

[41] *Id.*
[42] *Id.*
[43] *Id.* at 5.
[44] PX 3; PX 12.
[45] PX 3, at 4:7–4:10.
[46] *Id.* at 4:11–4:17.

10

Oaks made a presentation to the Council and the Plaintiffs' counsel in this Action also made a presentation.[47] Numerous opponents to the Proposed Ordinance—including many Plaintiffs in this Action—spoke at the meeting.[48]

At the end of the meeting, Councilman Cole, Vice President of the Council, remarked on a letter from the Delaware Department of Transportation ("DelDOT") that estimated the project "would generate more than 50 vehicle trips per weekly peak hour or 500 vehicle trips per day, and would be considered to have a Minor impact to the local area roadways."[49] The letter recommended that OA Oaks be required to perform a Traffic Impact Study ("TIS") for the project but also stated that per DelDOT's Development Coordination Manual: "where a TIS is required only because the volume warrants are met, and the projected trip generation will be less than 200 vehicle trips per a weekly peak hour and less than 2,000 vehicle trips per day, DelDOT may permit the developer to pay an Area-Wide Study Fee of $10 per daily trip in lieu of doing a TIS."[50] DelDOT stated that it would permit OA Oaks to pay an Area-Wide Study Fee of $12,020 "if the County were agreeable," while noting that payment of such fee "does not relieve a developer from having to make or participate in off-site improvements."[51] Noting the offer for OA Oaks to pay the

---

[47] *Id*. at 94:6–124:15.
[48] *Id*. at 124:19–156:16.
[49] *Id*. at 157:13–158:1; PX 13, at 1.
[50] PX 13, at 1.
[51] *Id*. at 1–2.

11

Area-Wide Study Free in lieu of a TIS, Councilman Cole asked: "[a]re we agreeing to these? I never knew we were in the process of that" and remarked: "I just don't understand that."[52] Councilman Cole asked Ms. Cornwell, the Sussex County Planning & Zoning Director, to get a clarification from the DelDOT representative who authored the letter.[53]

The Council met again on December 11, 2018—after the Zoning Commission's disapproval—in order to consider whether to approve the Proposed Ordinance.[54] Proposed findings of fact, which were ultimately incorporated into the Ordinance (as defined below) as the Council's findings of fact, were read into the record.[55] The findings of fact include:

- The Land Use Classification per the Comprehensive Plan is in the ESDA, which is a Growth Area, and that according to the Comprehensive Plan, "a wide range of housing types can be appropriate, including multi-family units"[56]

- The development is "intended to create modern, safe, affordable and fair housing options for the residents in the area" and that Sussex County "faces a severe shortage of affordable rental units"[57]

---

[52] PX 3 at 157:20–158:1. Mr. Cole also stated: "Because I don't know. We don't agree or disagree. We are not even part of it, I don't think, when it comes to them paying a fee in lieu of a study; at least I never knew we were." *Id*. at 158:8–158:11.
[53] *Id*. at 158:5–158:6.
[54] PX 4.
[55] *Id*. at 3:14.
[56] PX 16, at 5, 8. It also noted that the property remains in a growth area under a 2018 Comprehensive Plan. *Id*. at 5.
[57] *Id*. at 5.

- That the 2018 update to the Comprehensive Plan states that "the housing vision is to ensure the provision of decent, safe, affordable and fair housing opportunities to improve communities and quality [of] life of residents of Sussex County" and that "most housing on the eastern side of the County is new and often unaffordable to low income families, seasonal employees, entry level workers, or recent college graduates"[58]

- The site "is in close proximity to many services, markets, and employment opportunities available in the coastal resort area where there is a lack of rental houses"[59]

- The project will maintain approximately 10 acres of open space— roughly two-thirds of the parcel—there would be a 20-foot buffer along the boundary of the site, and 96% of the woodlands would be preserved[60]

- That the units would "create a housing option for lower and moderate income residents" and that 36 of the units would be designated as workforce housing units[61]

- "With the conditions and stipulations placed upon it, the RPC designation is appropriate, since it allows the creation of a superior environment through design ingenuity while protecting existing and future uses"[62]

- The development is in accordance with Sussex County policy to "[e]ncourage the creation of a full range of housing choices," "[e]ncourage the production of affordable rental units," "[a]ssure that rental units are dispersed throughout the County," and "[e]ncourage

---

[58] *Id*. at 6.
[59] *Id*. at 7, 9.
[60] *Id*. at 7.
[61] *Id*. at 8.
[62] *Id*. at 9.

13

development in Growth Areas as defined within the County's most current Comprehensive Plan and Areas of Opportunity as defined by the Delaware State Housing Authority to include a minimum percentage of affordable rental units on public water and sewer systems."[63]

Additionally, a condition was added to the Proposed Ordinance subsequent to the prior Council meeting relating to penalties for the Restricted Units.[64] That condition reads:

> In the event that more than 142 of the units are rented at Market Rate because fewer than 36 units are leased to Qualified Tenants (the 'Excess Market Rate Units'), [OA Oaks] or owner of the project shall be required to pay to Sussex County the monthly market rent collected from any Excess Market Rate Units. Any such funds collected by Sussex County shall be used and administered for housing purposes by the Sussex County Office of Community Development and Housing.[65]

At the November 13 meeting Councilman Burton had asked pointed questions about enforcement of the affordable housing element of the project.[66] OA Oaks' representative proposed a fine for any Restricted Units rented at market rates "equal to the money we're bringing in on the market rents relative to the money that we would have been bringing in on the discounted units . . . ."[67] However, the penalty in the enacted Ordinance (as defined below) is *not* the spread between the market rent and the discounted rent—it is the *entire* amount of rent received for any Excess

---

[63] *Id*.
[64] DX L., ¶ 3.
[65] PX 16, at 3.
[66] PX 3, at 75:7–75:11.
[67] *Id*. at 76:5–76:8.

Market Rent Units. Councilman Burton has submitted a sworn statement that "[i]t was at [his] request, based on [his] questioning of the applicant at the public hearing, that a financial penalty be added as one of the conditions to the rezoning. The actual wording of the condition was drafted by County staff."[68]

The Proposed Ordinance also included a deed restriction limiting the density of the Property to AR-1 if the Property was not built to the zoning density specified. The deed restriction, per the Ordinance (as defined below), reads:

> On the 11th day of December, 2018, the Sussex County Council rezoned this 14.84 acre parcel to an HR-1/RPC for the specific purpose of developing a 178-unit apartment development as depicted on the RPC Preliminary Site Plan submitted as part of CZ #1858. In the event the RPC is not developed and is declared null and void by Sussex County pursuant to §99-9B or §99-40A of the Sussex County Code, which are incorporated into §115-218 of the Zoning Code regarding RPCs by reference, then the permitted density of this 14.84 acre parcel shall not exceed 2.178 units per acre, representing the density prior to the approval of CZ #1858. This restriction shall not be amended nor modified without the approval of the Sussex County Council.[69]

At the December 11, 2018 meeting, after a spirited discussion, by a 3-2 vote—with Councilmen Artlett, Burton, and Vincent voting in favor—the Council approved the Proposed Ordinance and rezoning with the findings of fact discussed herein throughout.[70]

---

[68] DX L, ¶ 3.
[69] PX 16, at 4.
[70] PX 4, at 37:14; PX 16.

15

*E. Procedural History*

Ordinance 2621 (the "Ordinance") was enacted on December 11, 2018.[71] On February 1, 2019 the Plaintiffs filed their original complaint in this Action.[72] On March 12, 2019 the Plaintiffs filed their amended complaint (the "Amended Complaint").[73] Count I of the Amended Complaint asks for a Permanent Injunction under various theories discussed in detail in Section II, *infra*—the Amended Complaint asks that the Defendants be enjoined from taking any further development action based on the Application and Ordinance.[74] Count II of the Amended Complaint asks for a declaratory judgment that the Council's approval of CZ #1858 was "arbitrary, capricious, and illegal" and that this Court "should declare the approval of the rezoning application and the Council's Ordinance void and of no force or effect."[75] The Plaintiffs moved for Summary Judgment on May 16, 2019 and the Defendants cross-moved for Summary Judgment on June 17, 2019.[76] I heard Oral Argument on the Cross-Motions on December 18, 2019, at the conclusion of which I asked the Plaintiffs to submit a supplemental memoranda and offered the Defendants the right to respond.[77] The final supplemental memorandum was

---

[71] PX 16.

[72] Verified Compl., D.I. 1.

[73] Am. Compl.

[74] *Id.* ¶ 65.

[75] *Id.* ¶ 69.

[76] Pls.' Mot. for Summ. J, D.I. 14; Defs.' OA Oaks, LLC's and Anthony Crivella's Cross-Mot. for Summ. J., D.I. 28.

[77] Oral Arg. Tr., D.I. 40 ("Oral Arg. Tr."), at 63:18–64:12.

submitted on January 2, 2020 and I considered the matter submitted for decision on that date.[78]

## II. ANALYSIS

The parties have submitted Cross-Motions for Summary Judgment. To prevail on their Motion, "each party must show that there is 'no genuine issue as to any material fact' and that it is 'entitled to judgment as a matter of law.'"[79] "Where the parties have filed cross motions for summary judgment and have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[80] However, a court must deny summary judgment if a material fact dispute exists and the moving party bears the burden of showing there is no material question of fact.[81] "If the movant puts in the record facts which, if undenied, entitle him to summary judgment, the burden shifts to the defending party to dispute the facts by affidavit or proof of similar weight."[82] "Summary judgment will not be granted when the record reasonably indicates that a material fact is in dispute or 'if it seems desirable to

---

[78] Letter, D.I. 41.
[79] *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1029 (Del. Ch. 2008) (quoting Ch. Ct. R. 56(c)).
[80] Ch. Ct. R. 56(h).
[81] *Comet Sys.*, 980 A.2d at 1029.
[82] *Id*. (quoting *Tanzer v. Int'l Gen. Indus., Inc.*, 402 A.2d 382, 385 (Del. Ch. 1979)).

17

inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.'"[83]

The Plaintiffs in this Action challenge the change of zone of the Property from A-1 to HR-1 – RPC. The only residential use permitted in AR-1 zoned land is "[d]etached single-family dwellings on individual lots."[84] Subject to conditions, HR-1 zoning permits multifamily dwellings, townhouses, rooming, boarding, and lodging houses, as well as hotels, motels or motor lodges, as well as lesser uses.[85] The RPC overlay permits clustering of dwellings beyond what would be permitted otherwise.[86]

"Zoning is a legislative action presumed to be valid unless it is clearly shown to be arbitrary and capricious because it is not reasonably related to the public health, safety, or welfare."[87] A party challenging a rezoning decision has the burden of rebutting such presumption of validity and of showing the action was arbitrary and capricious.[88] "The Court's role in reviewing a zoning decision is limited to a review of the record to ascertain whether the decision is supported by substantial evidence, or whether it is in any way arbitrary, capricious, or an abuse of discretion."[89] "If the

---

[83] *Id.* (quoting *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962)).
[84] Sussex Cty. C. § 115-20.
[85] *Id.* § 115-45.
[86] *See id.* Ch. 115, Art. XVI.
[87] *Concerned Citizens of Cedar Neck, Inc. v. Sussex Cty. Council*, 1998 WL 671235, at *4 (Del. Ch. Aug. 14, 1998).
[88] *Id.* at *5.
[89] *Id.*

18

reasonableness of the zoning change . . . is 'fairly debatable', the judgment of the legislative body must prevail; and it thereupon becomes the duty of the courts to affirm even though there may be disagreement as to the wisdom of the change."[90]

Here, the Plaintiffs have challenged the Council's adoption of the Ordinance under four different legal theories: (1) that the Ordinance is inconsistent with and contrary to the Comprehensive Plan, (2) that the adoption of the Ordinance was "arbitrary and capricious," (3) that the zoning change here constituted contract zoning between the Council and OA Oaks, and (4) that the rezoning is spot zoning and is thus invalid.[91] Below, I analyze each theory, in turn.

*A. The Rezoning is Consistent with the Comprehensive Plan*

9 *Del. C.* Ch. 69 mandates the adoption of a comprehensive plan by Sussex County.[92] The same chapter permits Sussex County to regulate land use—but the power "may only be exercised to adopt or amend regulations that are in accordance with the approved, adopted comprehensive development plan."[93] Zoning

---

[90] *Willdel Realty, Inc. v. New Castle Cty.*, 281 A.2d 612, 614 (Del. 1971).

[91] Pls.' Opening Br.

[92] *See* 9 *Del. C.* § 6953(a)(2) ("The County shall have power and responsibility . . . (2) to adopt and amend comprehensive plans, or elements or portions thereof, to guide its future development and growth.").

[93] *Green v. Cty. Council of Sussex Cty.*, 508 A.2d 882, 889 (Del. Ch. 1986), *aff'd*, 516 A.2d 480 (Del. 1986) (internal citations and quotation marks omitted); *see* 9 *Del. C.* § 6904(a) ("Regulations adopted by the county government, pursuant to the provisions of this subchapter, shall be in accordance with the approved comprehensive development plan and shall be designated and adopted for the purpose of promoting the health, safety, morale, convenience, order, prosperity or welfare of the present and future inhabitants of Sussex County . . . .").

19

regulations adopted pursuant to the delegation of power in 9 *Del. C.* Ch. 69 must be "consistent with or in accordance with the particular scheme portrayed in the adopted comprehensive development plan."[94]  Here, therefore, I must examine the record in light of the Comprehensive Plan, and in light of the presumption of validity of the Ordinance.  If the Council's determination that the rezoning here accords with the Comprehensive Plan is supported by substantial evidence, even if its decision is reasonably debatable, I must sustain the Ordinance.  If, on the other hand I determine that substantial evidence is lacking to support the Council's determination "after reviewing the record and the substance of the adopted plan itself," I must find the Ordinance void.[95]

The pertinent determination is whether the Ordinance is inconsistent with the Comprehensive Plan or that it does not serve the goals of the Comprehensive Plan.[96]  In *Glassco v. County Council of Sussex County*, Chancellor Allen emphasized that a comprehensive plan is a "planning document" and that it is unreasonable to "interpret a planning document as one would interpret a statute or regulation."[97]  "Trade-offs between the various goals of managing development are contemplated by, and therefore consistent with, the [Comprehensive] Plan."[98]  Therefore, in order

---

[94] *Green*, 508 A.2d at 890.
[95] *Id*. at 890–91.
[96] *Concerned Citizens of Cedar Neck, Inc. v. Sussex Cty. Council*, 1998 WL 671235, at *5 (Del. Ch. Aug. 14, 1998).
[97] *Glassco v. Cty. Council of Sussex Cty.*, 1993 WL 50287, at *8 (Del. Ch. Feb. 19, 1993).
[98] *Id*. at *6.

for the Plaintiffs here to establish an inconsistency between the Ordinance and the Comprehensive Plan, the Plaintiffs "must show that the rezoning does not serve the goals of the plan in that it fails to strike a reasonable balance between these various goals. In this setting a balance is reasonable if it represents a conclusion supported by substantial evidence."[99] Upon review, I find that the Council's determination of consistency between the Ordinance and the Comprehensive Plan is based on substantial evidence.

To begin, the Plaintiffs have argued that the Council improperly relied upon the 2018 Update to the Comprehensive Plan, which had not yet been enacted at the time the Ordinance was adopted.[100] 9 *Del. C.* § 6959(c) mandates that "[a]ny application for a development permit filed or submitted prior to adoption or amendment under this subchapter of a comprehensive plan or element thereof shall be processed under the comprehensive plan, ordinances, standards and procedures existing at the time of such application."[101] There is no dispute that the 2018 Update did not take effect until April 1, 2019—after the adoption of the Ordinance—and that, consequently, the Ordinance must be consistent with the 2008 Comprehensive Plan (defined above as the "Comprehensive Plan") in order to be valid. However,

---

[99] *Id.*

[100] The Plaintiffs argue that the Council "erroneously relied upon the recommendations of an unapproved 2018 Plan while disregarding all of the . . . recommendations of the current Comprehensive Plan . . . ." Pls.' Opening Br., at 47.

[101] 9 *Del. C.* § 6959(c).

21

there is nothing disabling in the Council's citation to the 2018 Update to the Comprehensive Plan in the Ordinance.[102] My task is to determine whether substantial evidence supports consistency with the 2008 Comprehensive Plan.[103]

As I interpret their briefing, the Plaintiffs essentially offer three discrete alleged inconsistencies between the zoning change and the Comprehensive Plan that, in their view, render the Ordinance inconsistent with the Comprehensive Plan. The Plaintiffs argue that: (1) the rezoning is inconsistent with the "purpose" of High Density Residential Districts as defined in the Sussex County Code § 115-44, (2) the approved density is inconsistent with the maximum density for Environmentally Sensitive Developing Areas (ESDAs) permitted by the Comprehensive Plan, and (3) that the Council did not apply appropriate scrutiny as they allege is required because the Property is in an Investment Level 3 Area. I analyze each, and whether consequently an inconsistency exists with the Comprehensive Plan, below.

### 1. There is Substantial Evidence that the Property is an "Appropriate Area" for HR-1 Zoning

The Plaintiffs first argue that the character of the Property is inconsistent with the purpose of HR-1 zoning, as defined in the Sussex County Code, and instead is consistent with the purpose of AR-1 zoning, which was the pre-Ordinance zoning of

---

[102] *See* PX 16, at 6.
[103] *See Green v. Cty. Council of Sussex Cty.*, 508 A.2d 882, 890–91 (Del. Ch. 1986), *aff'd*, 516 A.2d 480 (Del. 1986).

22

the Property. The Plaintiffs contend the change of zone must be consistent with the purpose laid out in §115-44 of the Sussex County Code, because "the provisions of the Sussex County Zoning Ordinance are . . . regulations enacted to implement elements of the Comprehensive Plan."[104] Thus, per Plaintiffs, an inconsistency with a "purpose" provided in the Sussex County Code is also an inconsistency with the Comprehensive Plan. Assuming (without deciding) that this assertion is correct, and that a rezoning that conflicts with the "purpose" of another ordinance is void, I conclude that the Plaintiffs nonetheless have failed to show such conflict. Per Sussex County Code § 115-44 "purpose" of HR-1 districts is to:

> [P]ermit variety in housing types and provide for residential densities appropriate for areas which are or will be served by public sanitary sewer and water systems and which are well-located with respect to major thoroughfares, shopping facilities and centers of employment.[105]

The Plaintiffs argue that Opponents of the Ordinance presented evidence that "clearly indicates that the proposed site is proximate to woodlands, natural areas and the marshlands and Federal wetland areas," and that there are no "shopping facilities or centers of employments . . . in the vicinity of the rural site."[106]

---

[104] Pls.' Opening Br., at 41.
[105] Sussex Cty. C. § 115-44.
[106] Pls.' Opening Br., at 41. I also note that while the Plaintiffs do not argue that Route 20, on which the Property is located, is not a "major thoroughfare," they point out that no public transportation services exist on Zion Church Road. *Id*. at 40–41; *see* PX 18. However, nowhere does the Sussex County Code nor the Comprehensive Plan require that a road have public transportation to be a major thoroughfare.

The Plaintiffs contend that the Ordinance was also not in compliance with the "purpose" provision of AR-1 zoning, because the pre-Ordinance zoning status of the property was consistent with the "purpose" of AR-1 zoning:

> [T]o provide for a full range of agricultural activities and to protect agricultural lands, as one of the county's most valuable natural resources, from the depreciating effect of objectionable, hazardous and unsightly uses. They should also protect established agricultural operations and activities. These districts are also intended for protection of watersheds, water resources, forest areas and scenic values and, at the same time, to provide for low-density single-family residential development, together with such churches, recreational facilities and accessory uses as may be necessary or are normally compatible with residential surroundings. The AR regulations seek to prevent untimely scattering of more-dense urban uses, which should be confined to areas planned for efficient extension of public services.[107]

The AR-1 status, in the Plaintiffs' argument, is proper due to the characteristics of the surrounding area, and to deviate from such status is in itself inconsistent with the Comprehensive Plan.

Contrary to the Plaintiffs' assertions, I find that the Council could rationally conclude that the Property was an appropriate location for HR-1 zoning, consistent with Sussex County Code §§115-19, 44, because the Ordinance's findings contain substantial evidence supporting such conclusion. To begin, the Council's findings explicitly contradict the Plaintiffs' assertions on the character of the area: "Council found that the site is in close proximity to many services, markets and employment

---

[107] Sussex Cty. C. § 115-19.

opportunities available in the coastal resort area where there is a lack of rental houses . . . ."[108] The Plaintiffs argue that there is no public transportation in the area, but that is not part of the "purpose" of HR-1 zoning. Further, the Plaintiffs do not contest that the development will be served by public sanitary sewer and water systems and the Council found that "[t]he County Engineering Department has indicated that adequate wastewater capacity is available for the project as an HR-RPC. Central water will also be provided."[109]

In fact, the Council specifically found that "[t]he proposed development creates residential housing . . . in an area served by County sewer and Central water which is near major roads, shopping and centers of employment consistent with the purpose of the HR Zoning District."[110] The Plaintiffs argue that the area's rural character is incompatible with HR development. That is their sincere opinion, and is rational, if debatable. But stating that opinion is insufficient to the Plaintiffs' purpose here. It is the Plaintiffs' burden to challenge the Council's conclusion as not supported by substantial evidence—it is insufficient for the Plaintiffs to merely disagree with the characterization of the area. The Council's finding that the Property is near centers of employment is supported by its further finding that eastern Sussex County is "a tourism hub and relies on workers in the service and

---

[108] PX 16, at 7.
[109] Id. at 8.
[110] Id.

retail industry."[111]  On proximity to both employment and shopping centers, the Delaware State Housing Authority's comments in the PLUS Comment Letter support the Council's conclusion: "[t]his site is in close proximity to the many services, markets, and employment opportunities available in the coastal resort area."[112]  The Plaintiffs argue that the Property is not "well-located" with respect to shopping areas and employment, and is thus inconsistent with § 115-44 of the Sussex County Code.  The Council's determination that the Property was "well-located" with respect to employment and shopping was supported by substantial evidence, and I have no basis to disregard that finding.  I find the Council's conclusion that rezoning was consistent with the Code was reasonable, and consequently consistent with the Comprehensive Plan.

2. The Approved Density is Consistent with the Comprehensive Plan

The Comprehensive Plan Future Land Use Map identifies the Property as within an Environmentally Sensitive Developing Area (ESDA).[113]  Sussex County Code § 115-94.3 implements the ESDA designation by identifying "all lands designated as the 'Environmentally Sensitive Developing Area'" in the Comprehensive Plan as the Environmentally Sensitive Development District.[114]

---

[111] *Id*. at 6.
[112] DX H, at 15.
[113] PX 10.
[114] Sussex Cty. C. § 115-194.3(A)

26

That Section further specifies that "the maximum density shall be the allowable density of the underlying zoning district for developments using a central water and wastewater collection and treatment system."[115] The Plaintiffs argue that the density of 11.99 units per acre approved for the Property in the Ordinance is inconsistent with purported density restrictions in the Comprehensive Plan.[116]

The Plaintiffs, in alleging that the rezoning is inconsistent with the Comprehensive Plan, point to the following the definition of Environmentally Sensitive Growth Areas: "[t]hese are areas around the inland bays, where 2 units per acre should be the based density with the option to go to four units per acre using the Density Bonus/Open Space program noted above."[117] There is no dispute that the Density Bonus/Open Space program was *not* used in the rezoning to boost the density of the Property. The Plaintiffs also reference Table 8 of the Comprehensive Plan, which is entitled "Recommended Densities and Uses" and lists "Environmentally Sensitive Developing Area" under the heading of "Low to Medium Density", which *does not* include HR-1 zoning as an "Applicable Zoning District."[118] The Plaintiffs argue that the Comprehensive Plan's text and Table 8 "when read together, indicate that the Application's proposed density is grossly in

---

[115] *Id.* § 115-194.3(C)(3)
[116] *See* PX 16, at 9.
[117] PX 11, at 1-2. I note that the page numbers in the Comprehensive Plan have the number format #-#, and the hyphen does not indicate a page range.
[118] PX 19, at 3-21. This PX is likewise from the Comprehensive Plan.

excess of the [Comprehensive] Plan's regulations for the Environmentally Sensitive Developing Areas."[119] In other words, they argue that no property in an ESDA can exceed two (or in circumstances not pertinent here, four) units per acre.

It is, I note, disputable the extent to which the density of the Property permitted in the Ordinance is inconsistent at all with the Comprehensive Plan. The Defendants point out that the Comprehensive Plan states that in Environmentally Sensitive Growth Areas "2 units per acre *should* be the base density" and that "[m]ost of the Environmentally Sensitive Developing Areas *should* continue to allow 2 homes per acre. The option *should* exist to go up to 4 units per acre if the developer uses optional density bonuses."[120] Likewise, Table 8, cited to by the Plaintiffs, is entitled "*Recommended* Densities and Uses."[121] The Defendants argue that "Should" and "Recommended," as used here, are not words of compulsion. Plaintiffs' counsel at Oral Argument strenuously disagreed, on grammatical and textual grounds.[122] However, even giving the Plaintiffs the benefit of their reading

---

[119] Pls.' Opening Br., at 44.
[120] PX 11, at 1-2, 3-16 (emphasis added).
[121] PX 19, at 3-21 (emphasis added).
[122] Oral Arg. Tr., at 8:16–8:24 ("And I emphasize the word 'should' is used there, as did Mr. Forsten. Mr. Forsten's brief suggests that 'should' is not 'shall.' But 'should' is the past tense of 'shall.' And shall ordinarily implies duty or obligation, as does should. That's a Black's Law Dictionary definition. And as you know, the first rule of the statutory construction is to use ordinary meanings of words. 'Should' implies an obligation or a duty."). I note that "shall" and "should" are auxiliary verbs, that "shall" implies future behavior, and that "should" (as shall's past tense) functions as an indication of future obligation or certainty *from the perspective of the past*: thus, "I know once I am a judge I shall have to write footnotes" versus "I knew once I was a judge I should have to write footnotes." But in common usage, I also note, shall, not should, is the

28

of the Comprehensive Plan, because the Comprehensive Plan is a "planning document," I am not to interpret it "as [I] would interpret a statute or regulation."[123] The Comprehensive Plan contemplates "trade-offs between the various goals of managing development" and in order to invalidate the Ordinance, the Plaintiffs must demonstrate that the rezoning "fails to strike a reasonable balance between these various goals."[124] It is not enough to show that a rezoning conflicts with a single goal if it reasonably promotes the various goals of the Comprehensive Plan. Thus, even if a restriction of 2 to 4 units per acre density and the exclusion of H-1 zoning on Table 8 for ESDAs are clearly-stated goals of the Comprehensive Plan, the rezoning may still be consistent with the Comprehensive Plans if it strikes a reasonable balance between these density restrictions and *other goals* for ESDAs expressed in the Comprehensive Plan.

Notably, the Comprehensive Plan states that the Environmentally Sensitive Developing Area designation "recognizes two characteristics of these areas. First, these regions are among the most desirable locations in Sussex County for new housing . . . Second, these regions contain ecologically important wetlands and other coastal lands that help absorb floodwaters and provided extensive habitat for native

---

imperative: "among the factors that should be considered" is less imperative than "among the factors that shall be considered."

[123] *Glassco v. Cty. Council of Sussex Cty.*, 1993 WL 50287, at *8 (Del. Ch. Feb. 19, 1993).
[124] *Id*. at *6.

flora and fauna."[125] "The challenge" for ESDAs, notes the Comprehensive Plan, is "to safeguard genuine natural areas and mitigate roadway congestion without stifling the tourism and real estate markets that: a) provide many jobs; b) creates business for local entrepreneurs; and c) help keep local tax rates reasonable."[126] Consistent with *Glassco*'s directive than a rezoning will be inconsistent with a Comprehensive Plan only where the rezoning fails to strike a reasonable balance between competing goals, the Comprehensive Plan's *own language* outlining the goals for ESDAs is written in terms of a balance, between economically beneficial development, on one side, and ecological preservation on the other.

The Comprehensive Plan states that ESDAs can "accommodate development provided special environmental concerns are addressed."[127] A "range of housing types should be permitted" including single-family homes, townhouses and *multi-family units*.[128] The Comprehensive Plan continues: "[c]areful mixtures of homes with light commercial and institutional uses can be appropriate to provide convenient services and to allow people to work close to home. Major new industrial uses are not proposed in these areas."[129] On density, beyond what the Plaintiffs have quoted, the Comprehensive Plan states that "[s]maller lots and flexibility in

---

[125] PX 11, at 3-15.
[126] *Id*.
[127] *Id*. at 3-16.
[128] *Id*.
[129] *Id*.

dimensional standards should be allowed if the developer uses a cluster option that results in permanent preservation of a substantial percentage of the tract."[130] Furthermore, "[c]entral water and sewer facilities are strongly encouraged. If central utilities are not possible, permitted densities should be limited to 2 units per acre."[131] Here, notably, the Council considered that central water and sewer are available, wetlands and woodlands will be protected, and that the ESDA designation contemplates multi-family housing. It noted that two-thirds of the parcel would remain open space.

In addition to goals and considerations specific to ESDAs, the Comprehensive Plan lists "important goals" on which "Sussex County's future land use policies are based":

- Direct development to areas that have community services or can secure them cost effectively

- Conserve the County's agricultural economy by promoting farming and preserving agricultural land values

- Protect critical natural resources, such as the inland bays and others, by guarding against over-development and permanently preserving selected lands

- Encouraging tourism and other responsible commercial industrial job providers to locate and invest in the County

- Expand affordable housing opportunities, particularly in areas near job centers

---

[130] *Id.*
[131] *Id.*

31

- Ensure that new developments incorporate preserved usable open space and other best practices in subdivision design

- Make Sussex County's growth and conservation policies clear to relevant Delaware State agencies, neighboring counties and Sussex County's incorporated municipalities[132]

These goals, while not specific to ESDAs, are necessarily part of any zoning consideration implicating ESDAs, because the Council must determine whether the rezoning of the ESDA is consistent not only with the goals of ESDAs, but also with the overarching goals of the Comprehensive Plan. A review of the findings of fact made by the Council shows that they specifically considered, and presumably balanced, these goals.

The Ordinance notes a finding that of the approximately 4.9 forested acres on the site only .18 acres would be removed and 96% of the woodlands would be preserved.[133] 10 acres of open space will be maintained, and the plan "includes large wooded buffers on both sides of the site."[134] Moreover, the Council found that there are 2.12 acres of non-tidal wetlands located at the rear of the Property and that the development plan provides for a minimum 40-foot buffer along the wetland line.[135] Further, the Council found that "there are no known historical or endangered species

---

[132] *Id.* at 3-7–3-8 (listing the "important goals").
[133] PX 16, at 7.
[134] *Id.* at 9.
[135] *Id.* at 7.

32

on the site."[136]  The Council found that while taking these safeguards to protect the environment, the development will provide for "housing opportunity for the workforce" and that "without an adequate supply of affordable rental housing in close proximity to employment and town centers, the County's workforce must commute a great distance for work which has a negative effect on the environment and transportation . . . ."[137]

Moreover, the density guidelines for ESDAs in the Comprehensive Plan explicitly permit multi-family housing (such as is contemplated here), and state that "[s]maller lots and flexibility in dimensional standards should be allowed if the developer uses a cluster option that results in permanent preservation of a substantial percentage of the tract."[138]  The Council found that the RPC designation (permitting clustering) is "appropriate, since it allows the creation of a superior environment through design ingenuity while protecting existing and future uses."[139]  The Council also found that adequate wastewater capacity exists and central water is provided in accordance with the Comprehensive Plan's emphasis on central water and sewer as a condition for moving beyond a 2 unit per acre density.[140]

---

[136] *Id.*
[137] *Id.* at 5–6.
[138] PX 11, at 3-16.
[139] PX 16, at 9.
[140] *See* PX 11, at 3-16.

Beyond recognizing and accounting for the balance required in the Comprehensive Plan for ESDAs, many of the Council's findings touch on the more general "important goals" for Sussex County future land use. The Council found that the Property "is near major roads, shopping and centers of employment," and Comprehensive Plan has a goal of "direct[ing] development to areas that have community services."[141] The Council's findings regarding the tract preservation and buffers cited to above relate to the goals of "[p]rotect[ing] critical natural resources", and "[e]nsur[ing] that new developments incorporate preserved usable open space and other best practices in subdivision design."[142] The Council had before it evidence indicating that the project would "[e]ncourag[e] tourism" by providing workforce housing in eastern Sussex County, which is "a tourism hub and relies on workers in the service and retail industry."[143] The Council noted the need for affordable housing in the area, consistent with the Comprehensive Plan's stated goal of "[e]xpand[ing] affordable housing opportunities, particularly in areas near job centers."[144]

In conclusion, the Comprehensive Plan is a planning document in which trade-offs are contemplated and the Ordinance may only be held as inconsistent with

---

[141] PX 16, at 8; PX 11, at 3-7.
[142] PX 11, at 3-7–3-8.
[143] *Id*. at 3-8; PX 16, at 6.
[144] PX 11, at 3-8.

the Comprehensive Plan where it "fails to strike a reasonable balance between these various goals."[145] I find that the 11.99 units per acre density approved by the Council in the Ordinance was *not* inconsistent with the Comprehensive Plan because the evidence before the Council was sufficient for it to find the Ordinance to be a reasonable balance between the competing goals of the Plan—specifically with regard to ESDAs and generally with regarding to the overarching goals of the Comprehensive Plan. In other words, the Council's decision to authorize the density was supported by substantial evidence.[146]

### 3. The Plaintiffs Have Failed to Articulate What "Special Scrutiny" Would Require Beyond the Council's Actions Here

Finally, the Plaintiffs argue that the Council did not properly consider the Application considering that the Property is in an Investment Level 3 Area.[147] I confess to not fully comprehending this argument. The Comprehensive Plan incorporates a scheme of four Levels of Investment from the "Delaware Strategies

---

[145] *Glassco v. Cty. Council of Sussex Cty.*, 1993 WL 50287, at *6 (Del. Ch. Feb. 19, 1993).

[146] I note that in their supplemental memorandum, the Plaintiffs point to 9 *Del. C.* § 6956(g)(1), which states that "[t]he plan shall include standards to be followed in the control and distribution of population densities and building and structure intensities . . . [and] [e]ach land use category shall be defined in terms of the types of uses included and standards for the density or intensity of use." *See* Letter, D.I. 39. Per the Plaintiffs, this renders the Ordinance inconsistent with the Comprehensive Plan. To the extent this argument was not waived, that section does not convert the two-to-four units per acre standard from precatory to mandatory, but merely requires that the Comprehensive Plan have such standards and that they are defined in certain terms. That language does not alter the requirement that compliance with the Comprehensive Plan must be analyzed in light of whether the rezoning fails to strike a reasonable balance between the various goals of the Comprehensive Plan. *See Glassco*, 1993 WL 50287, at *6.

[147] *See* PX 16, at 5.

35

for State Policies and Spending" which "clarify the State's policies and priorities for the expenditure of State funds on infrastructure."[148] The Plaintiffs cite the following language regarding Investment Level 3:

> In Sussex County's case, much of the Environmentally Sensitive Developing Area is designated as Level 3. This designation acknowledges that these areas are part of the County's future growth zone. However, this designation also suggests that special scrutiny should be applied to spending decisions and development proposals within these areas to ensure these activities are consistent with State and local development and preservation policies.[149]

In line with this language, the Plaintiffs "contend that the Council did not apply 'special scrutiny' on deciding to rezone [the Property]."[150] The Plaintiffs further state that "neither the Council's oral deliberations nor the Findings in [the Ordinance] evidence a balancing test of the regulations and guidelines of the Plan or the [a]pplication of 'special scrutiny' to determine if the proposed development was consistent with the County's development policies."[151]

Notwithstanding the Plaintiffs' citation of the language above, the Plaintiffs have offered no case-law, nor even a suggestion as to how I should review the Ordinance and the record to evaluate compliance with the Comprehensive Plan's "suggest[ion] that special scrutiny should be applied" to lands designated as

---

[148] PX 11, at 3-12.
[149] *Id*. at 3-13.
[150] Pls.' Opening Br., at 45.
[151] *Id*.

36

Investment Level 3. The Plaintiffs fail to identify State spending or projects required by the zoning change. The language here is precatory. There is simply no basis to challenge the Ordinance based on the "special scrutiny" provision to which the Plaintiffs cite.

### B. The Council's Actions Were Not Arbitrary and Capricious

Even if the Ordinance is compatible with the Comprehensive Plan, argue the Plaintiffs, it must nonetheless be struck down because the Council's actions were "arbitrary and capricious." Our Supreme Court has stated that "[t]he decision of a County Council on a rezoning ordinance is presumed to be valid unless it is clearly shown to be arbitrary and capricious."[152] The Plaintiffs have the burden to rebut this presumption and of demonstrating clearly that the action is arbitrary and capricious.[153] "The role of the court in reviewing a zoning decision is narrow and focused, with the purpose being 'to determine whether [Council's] acts are supported by a 'record of substantial evidence' and whether its ultimate determination is arbitrary and capricious.'"[154]

A zoning decision will be deemed arbitrary and capricious "where it is the product of 'an unreasoned, irrational or unfair process.'"[155] In *Save Our County,*

---

[152] *Barley Mill, LLC v. Save Our Cty.*, Inc., 89 A.3d 51, 60 (Del. 2014) (citing *Tate v. Miles*, 503 A.2d 187, 191 (Del. 1986); *Willdel Realty, Inc. v. New Castle Cty.*, 281 A.2d 612, 614 (Del. 1971)).
[153] *TD Rehoboth LLC v. Sussex Cty. Council*, 2017 WL 3528391, at *6 (Del. Ch. Aug. 11, 2017).
[154] *Id*. (quoting *Save Our Cty., Inc. v. New Castle Cty.*, 2013 WL 2664187, at *9 (Del. Ch. June 11, 2013), *aff'd sub nom.*, *Barley Mill*, 89 A.3d 51)).
[155] *Id*. (quoting *Save Our Cty.*, 2013 WL 2664187, at *9).

*Inc. v. New Castle County*,[156] this Court offered several ways in which a legislative

act of the Council can be found arbitrary and capricious:

> For example, the action can be whimsical or fickle or not done according to reason. This Court may find an action arbitrary [] if it was unconsidered or taken without consideration of and in disregard of the facts and circumstances of the case. The [] Council must also act rationally and fairly apply its zoning code and regulations and not in an arbitrary fashion that subjects some property owners to unwritten, subjective restrictions that the Council is not willing to impose on similarly situated property owners.[157]

Consistent with the deference afforded to the Council's legislative determinations,

the court "must focus on the decision made by Council, as expressed by its members,

when determining whether the bases for that decision can be discerned from the

record and whether it was 'arbitrary and capricious.'"[158] In reviewing the record to

determine if the rezoning is arbitrary and capricious, "it is enough that Council states

its reasons with sufficient clarity that the court is not left to guess why the decision

was made and is able to make the requisite determination that the decision was not

the product of arbitrary or capricious reasoning."[159]

The Plaintiffs have offered what boils down to three reasons why the

Ordinance was arbitrary and capricious. First, the Plaintiffs argue that the workforce

housing element was not part of Sussex County's existing workforce housing

---

[156] 2013 WL 2664187.
[157] *Id*. at *9 (internal citations, quotation marks, and ellipses omitted).
[158] *TD Rehoboth*, 2017 WL 3528391, at *6.
[159] *Id*. at *7.

program and approval of the Ordinance based on these separately negotiated workforce housing conditions must therefore be arbitrary and capricious. The Plaintiffs also argue that the Council ignored the recommendations of its Planning Director, the Zoning Commission, and CD&H. Finally, the Plaintiffs contend that the three councilmembers voting in favor did not adequately address the requirements of 9 *Del. C.* § 6904. I address each argument below.

### 1. Approval Based on the Workforce Housing Element Was Not Arbitrary and Capricious

The Plaintiffs contend that the Ordinance would not have been passed without the workforce housing conditions and that, because the workforce housing in the Ordinance was not part of Sussex County's existing Sussex County Rental Program (the "SCRP"), reliance on workforce housing to justify passing the Ordinance was "arbitrary and capricious."[160] The Plaintiffs cite Councilman Arlett's belief that Sussex County has a "moral obligation" to provide affordable housing and Councilman Burton's "passion for the workforce/affordable housing issue."[161] In the Plaintiffs' view, the Council's rezoning decision "was based upon perceived moral obligations and upon a belief that the County's affordable housing legislation

---

[160] *See* Sussex Cty. C. Ch. 72.
[161] *See* Pls.' Opening Br., at 48–49.

was 'not working,'" and that the Council should have revised the SCRP in order to permit the HR-1 – RPC zoning designation granted in the Ordinance.[162]

Before turning to the substantive argument, I note that Plaintiffs have placed into the record two items: a Cape Gazette article detailing an affordable housing town hall that Councilman Burton attended[163] and a picture of an "Artlett for Senate" sign on the Property.[164] Plaintiffs, I assume, wish me to void the vote in favor of the Ordinance because of the self-interest of two Councilmen, without the vote of whom the Ordinance would not have passed. Plaintiffs cry "bias" against Mr. Burton because OA Oaks' spokesperson also attended that affordable housing town hall, and thus Mr. Burton has a "bias toward approval of a proposal that includes private affordable housing."[165] As for Mr. Artlett the Plaintiffs note: "Mr. Artlett's vote may have been unduly influenced by the existence of an 'Artlett for Senate' political sign upon the [Property]."[166] The Plaintiffs offer *no other evidence* in their attempt to tar two members of the Sussex County Council with voting bias. The Plaintiffs' counsel attempts to distance himself from the Artlett calumny, thus: "Plaintiffs have directed the undersigned attorney to express their strong concern that Mr. Artlett's vote may have been unduly influenced . . . ."[167] I find that neither item, without

---

[162] *Id.* at 52.
[163] PX 20.
[164] PX 21.
[165] Pls.' Opening Br., at 51.
[166] *Id.* at 49.
[167] *Id.*

40

more, is sufficient to infer bias on the part of Messrs. Burton and Artlett. Quite the contrary. The suggestions of public corruption on such threadbare assertions I find frivolous and invidious. I turn, then, to the allegations that the Council's actions were arbitrary and capricious.

The Council's findings provide ample support for approving the Ordinance in reliance on the affordable housing element. The Council specifically found that the County had not received any applications for SCRP since amendments to the program in 2016.[168] This supports the conclusion, expressed by Councilman Vincent that "we have a program in the County that we've had for years that has not worked. I think we have to try something that hopefully will work."[169] The Council found that the 36 Restricted Units to be offered in the development here would create housing opportunities for low and moderate income Sussex County residents who qualify for workforce housing.[170]

The Plaintiffs point out, correctly, that the Council approved a workforce housing scheme outside of the SCRP, but fail to explain how that should compel a finding that the Council's actions were arbitrary and capricious. The rezoning decision was not "unconsidered or taken without consideration of and in disregard

---

[168] PX 16, at 6.
[169] PX 4, at 37.
[170] PX 16, at 9.

41

of the facts and circumstances of the case."[171] The Council found that "Sussex County rents had inflated far beyond the ability of an average wage earner to pay."[172] The Council approved the workforce housing scheme in the Ordinance in an attempt to remedy this problem and the record suggests that they had reason to believe it would do so. The attempt to remedy an identified problem through a creative exercise of the Council's zoning powers does not render the Ordinance arbitrary and capricious. The Plaintiffs may wish that the Council provided for workforce housing through the SCRP exclusively, and had not rezoned the Property. Certainly, the Council's actions represent a policy with which citizens and property owners may strongly disagree, as the Plaintiffs do here. But that is not the analysis I must employ. Considering the deference I must afford the Council's rezoning decision, the Council's decision to approve the workforce housing element of the Ordinance outside of the established SCRP was based on evidence of record, considered by the Council members in a reasoned process.[173] It was therefore not arbitrary or capricious.

---

[171] *Save Our Cty., Inc. v. New Castle Cty.*, 2013 WL 2664187, at *9 (Del. Ch. June 11, 2013), *aff'd sub nom.*, *Barley Mill, LLC v. Save Our Cty.*, 89 A.3d 51 (Del. 2014)) (internal quotation marks omitted).
[172] PX 16, at 6.
[173] *See Barley Mill*, 89 A.3d at 60 (Del. 2014).

### 2. The Council Did Not Arbitrarily or Capriciously Ignore Recommendations

The Plaintiffs argue that the Council arbitrarily and capriciously ignored the advice and recommendations of CD&H, the Planning & Zoning Director, and the Zoning Commission.

The letter to the Zoning Commission from CD&H stated that its target range for low-to-moderate income is 30%–80% of Area Median Income ("AMI"); the Restricted Units here are available to those earning up to 70% of AMI.[174]  CD&H also stated that the workforce housing program in the Ordinance is *not* included in SCRP.[175]  Finally, CD&H stated that it viewed the Application as "solely a land-use decision" because it was not part of SCRP.[176]  CD&H does not have the authority to veto a zoning change, nor did it attempt to do so here.[177]  The Ordinance does not reflect some of the recommendations made by CD&H, but that does bear on whether the Council's actions are arbitrary or capricious.  The latter contention must be analyzed by reference to the record, the Council's findings of fact and the stated

---

[174] PX 6, at 1.
[175] *Id*.
[176] *Id*..
[177] *See* Sussex Cty. C. Ch. 72 (concerning CD&H's authority); Sussex Cty. C. § 115-216(A) ("The County Council may from time to time amend, supplement or change, by ordinance, the boundaries of the districts or the regulations herein established.  Any such amendment may be initiated by resolution of the County Council or by motion of the Planning and Zoning Commission or by petition of any property owner addressed to the County Council.").

reasons for council members' votes, an issue I address elsewhere in this Memorandum Opinion.

In any event, the Council *did not ignore* CD&H. CD&H reviewed the conditions on the Restricted Units and proposed new language pertaining to examination by an independent certified public accountant.[178] The Council did not ignore this recommendation; this language was ultimately incorporated into the Ordinance.[179]

The Plaintiffs also argue that the Council ignored the Planning and Zoning Director's statement that the change of zone would be "inconsistent with area zoning and uses."[180] Again, the conclusions of Planning and Zoning, and its director, are not binding on the Council, which is the legislative body charged with addressing rezoning applications.[181] In any event, the Director's staff analysis letter is not unequivocal. It goes on the state that the change of zone "could be considered consistent with land use."[182] The Council's findings methodically discuss the zoning of the land in the surrounding area and that the Property "is near major roads, shopping and centers of employment consistent with the purpose of the HR Zoning District."[183] At best, the record reflects a disagreement between the Planning and

---

[178] PX 6, at 1–2.
[179] PX 16, at 3.
[180] PX 7, at 1.
[181] Sussex Cty. C. § 115-216(A).
[182] PX 7, at 1.
[183] PX 16, at 5, 8.

44

Zoning Director and the Council.  This Court noted in *Hudson v. County Council of Sussex County*[184]:

> Much of plaintiffs' argument consists of contentions that there is evidence contradicting the findings of the Council.  This Court, however, will not disturb the factual findings of a council even if it may deem the evidence supporting a contrary conclusion to be more compelling than that which the Council apparently accepted, provided that the reasonableness of the rezoning is fairly debatable.  Rather, the question is whether the evidence in support of the Council's decision, taken alone, is sufficient to sustain it.  Such decisions are presumed to be correct.[185]

Here, there is sufficient evidence to support the Council's findings that the proposed development is consistent with surrounding land uses and thus consistent with the HR Zoning District.  The evidence included that the surrounding properties were zoned GR, B-1, and C-1—in addition to AR-1—the zoning does not create an island of non-AR-1 zoning in the middle of an AR-1 sea.[186]  The record reflects that the Council was aware of and considered the surrounding area and determined that the rezoning was appropriate—the Plaintiffs strongly disagree, but this does not bear on the issue of whether the Ordinance was arbitrary and capricious.

The Plaintiffs also argue that the Council ignored the decision of the Zoning Commission.  As the analysis above makes clear, the decisions of the Zoning

---

[184] 1988 WL 15802 (Del. Ch. Feb. 24, 1988), *aff'd*, 549 A.2d 699 (Del. 1988).
[185] *Id*. at \*5 (internal citations and quotation marks omitted).
[186] GR is "General Residential District," B-1 is "Neighborhood Business District," and C-1 is "General Commercial District."  Sussex Cty. C. § 115-5.

Commission are neither binding nor determinative of whether the Council acted appropriately. A review of the Zoning Commission's own minutes reflect *no reasoning* for its disapproval of the Application.[187] Thus, the Plaintiffs ask me to strike down the Ordinance, supported by over five pages of factual findings, because it ignored a non-binding recommendation without any record of the reasons for its disapproval. As discussed throughout, the Council offered sufficient support for its rezoning decision such that its decision was not arbitrary and capricious. Disagreement with a 3-2 non-binding disapproval of the Application offers no ground to determine that the Council's actions were arbitrary and capricious.

3. The Council's Findings Adequately Address the Requirements of 9 *Del. C.* § 6904

The Plaintiffs' final argument that the adoption of the Ordinance was arbitrary and capricious is that the three Councilmembers who voted to approved the Ordinance did not adequately address 9 *Del. C.* § 6904(a) and (b). Those Sections read:

> (a) Regulations adopted by the county government, pursuant to the provisions of this subchapter, shall be in accordance with the approved comprehensive development plan and shall be designated and adopted for the purpose of promoting the health, safety, morale, convenience, order, prosperity or welfare of the present and future inhabitants of Sussex County, including, amongst other things, the lessening of congestion in the streets or roads or reducing the waste of excessive amounts of roads, securing safety from fire, flood, and other dangers, providing adequate light and air, preventing on the one hand excessive

---

[187] *See* PX 15.

46

concentration of population and on the other hand excessive and wasteful scattering of population or settlement, promoting such distribution of population and such classification of land uses and distribution of land development and utilization as will tend to facilitate and provide adequate provisions for public requirements, transportation, water flowage, water supply, water and air pollution abatement, drainage, sanitation, educational opportunities, recreation, soil fertility, food supply, protection of the tax base, securing economy in governmental expenditures, fostering the State's agricultural and other industries, and the protection of both urban and nonurban development.

(b) The regulations shall be made with reasonable consideration, among other things, of the character of the particular district involved, its peculiar suitability for particular uses, the conservation of property values and natural resources and the general and appropriate trend and character of land, building and population development.

The Plaintiffs contend that the Councilmembers did not consider the "the lessening of congestion in the streets or roads" as required by 9 *Del. C.* §6904. They support this argument by referring to the DelDOT letter discussed*, supra*, and Plaintiffs' traffic-related objections to the Application. Additionally, the Plaintiffs cite the concerns raised at the November 13, 2018 meeting by Councilman Cole regarding the DelDOT letter discussing the option for the developer to pay a fee in lieu of a TIS. To my mind, Councilman Cole's concerns appear to address the procedure at issue—the proposed practice of DelDOT to permit the developer to pay a fee with the County's approval, and thus avoid a TIS—rather than traffic issues specific to the rezoning. Additionally, rather than ignoring the DelDOT letter, as the Plaintiffs suggest, the Council found that "the applicant is permitted to pay an area-wide study

47

fee."[188]   Additionally, DelDOT's letter stated that the development "would be considered to have a Minor impact to the local area roadways"—mitigating any argument the Plaintiffs have that the development will cause untold traffic problems.[189]

The record reflects that the Council gave due consideration to traffic effects of the development. The Council found that DelDOT will require a Right-of-Way dedication; that OA Oaks will be required to establish a 15-foot permanent easement; that the site entrance will be required to conform to DelDOT standards and that DelDOT reserves the right to require a Traffic Operational Analysis.[190] The Council also found that "road improvements were done to Route 54 as part of the Americana Bayside development."[191] Route 54, I note, is the roadway that would carry traffic to and from the businesses in the beach resort of Fenwick Island. None of this evinces a disregard of §6904(a)'s directive that regulations be adopted to lessen congestion. Of course, the statute directs regulations to consider a large number of considerations, and not simply traffic, in any event.

The Plaintiffs note that the public comments to the rezoning were mainly negative. The Plaintiffs certainly would have weighed these statements (in addition

---

[188] PX 16, at 7.
[189] PX 3, at 157:13–158:1; PX 13, at 1.
[190] PX 16, at 7.
[191] *Id.*; *see* PX 3, at 157:13–158:11; PX 13.

to the remainder of the record before the Council) differently from the way the Council itself viewed them. This is of no moment so long as the actions of the Council were not arbitrary. "The testimony of lay witnesses concerning the future of the area to be affected by a proposed rezoning has probative value and may be considered by the Legislative Body . . . the Council was free to weigh the credibility and value of all the evidence before it, including the testimony of the non-expert witnesses and the findings of its staff."[192] The question is whether the Ordinance "is the product of 'an unreasoned, irrational or unfair process,'" not whether the Plaintiffs disagree with the Council regarding the traffic impact of the development, whether the evidence could rationally support another outcome, or, for that matter, whether the Plaintiffs could persuade the Court to prefer a different outcome.[193] The consideration by the Council of the impact of the Ordinance on traffic was not arbitrary or capricious.

The Plaintiffs also argue that Councilman Burton did not address traffic issues or any elements of 9 *Del. C.* § 6904, and that he has consequently not left a reviewable record as required by Delaware law. However, the Ordinance states:

> WHEREAS, on the 13th day of November 2018, a public hearing was held, after notice, before the County Council of Sussex County and the

---

[192] *Bayville Shore Dev. Corp. v. Cty. Council of Sussex Cty.*, 1992 WL 14957, at *3 (Del. Ch. Jan. 9, 1992) (internal citations omitted).

[193] *TD Rehoboth LLC v. Sussex Cty. Council*, 2017 WL 3528391, at *6 (Del. Ch. Aug. 11, 2017) (quoting *Save Our Cty., Inc. v. New Castle Cty.*, 2013 WL 2664187, at *9 (Del. Ch. June 11, 2013), *aff'd sub nom.*, *Barley Mill, LLC v. Save Our Cty.*, 89 A.3d 51 (Del. 2014)) (internal quotation marks omitted).

County Council of Sussex County has determined, based on the findings of facts, that said change of zone is in accordance with the Comprehensive Development Plan and promotes the health, safety, moral, convenience, order, prosperity and welfare of the present and future inhabitants of Sussex County.[194]

In approving the Ordinance, Burton "found that the Change of Zone was appropriate legislative action based on the . . . Findings of Fact."[195] Plaintiffs' argument is foreclosed by *Deskis v. County Council of Sussex County*[196]:

The plaintiffs' contention that each County Council member must articulate his or her individual reasons for voting for the Ordinance (over and above voting for the findings of fact) finds no basis in Delaware statutory or case law. The Council members specifically voted for those . . . findings of fact, which articulate why the County Council voted collectively for the Ordinance. Under Delaware law that is sufficient.[197]

Thus, the Council, including Councilman Burton, found that the change of zone "promotes the health, safety, moral, convenience, order, prosperity and welfare of the present and future inhabitants of Sussex County."[198] Contrary to the Plaintiffs' assertions that Councilman Burton's decision "reflected an arbitrary and capricious decision-making process based exclusively upon Sussex County's need for provision of affordable housing," Councilman Burton found that the Ordinance

---

[194] PX 16, at 5.
[195] *Id.*
[196] 2001 WL 1641338 (Del. Ch. Dec. 7, 2001).
[197] *Id.* at *5.
[198] PX 16, at 5.

conforms with 9 *Del C.* § 6904 in accordance with the findings of fact. Therefore, Councilman Burton's vote was not arbitrary and capricious.

### C. The "Penalties" Provision is Not Contract Zoning

The Plaintiffs next argue that the "Penalties" provision associated with the affordable housing element constitutes illegal "contract" zoning. That provision reads:

> In the event that more than 142 of the units are rented at Market Rate because fewer than 36 units are leased to Qualified Tenants (the 'Excess Market Rate Units'), [OA Oaks] or owner of the project shall be required to pay to Sussex County the monthly market rent collected from any Excess Market Rate Units. Any such funds collected by Sussex County shall be used and administered for housing purposes by the Sussex County Office of Community Development and Housing.[199]

The Plaintiffs contend that this provision is "a private agreement between the Applicant and the County, offered in consideration for approval of the Application and accepted by [the] Council" constituting contract zoning.[200]

"Contract zoning occurs when a landowner and a zoning authority agree to alter zoning to the landowner's benefit in exchange for other promises."[201] The necessary element of an impermissible contract zoning is a bargained-for commitment to rezone, outside the public zoning legislative process.[202] "[C]ontracts

---

[199] *Id*. at 3.
[200] Pls.' Opening Br., at 57.
[201] *Port Penn Hunting Lodge Ass'n v. Meyer*, 2019 WL 2077600, at *7 (Del. Ch. May 9, 2019), *aff'd*, 222 A.3d 1044 (Del. 2019).
[202] *Id.*

between a municipality and a developer to rezone in accordance with mutual promises are . . . *per se* invalid in Delaware" because "[i]t is elementary that the legislative function may not be surrendered or curtailed by bargain or its exercise controlled by the considerations which enter into the law of contracts."[203]  In other words, the Council may not sell the application of its legislative function; it may not bargain away the power delegated to it from the legislature to impose zoning in the public interest, in return for other consideration.

The prohibition against contract zoning is illuminated by *Hartman v. Buckson*.[204]  In that case a developer's application for a subdivision of 88 townhouses on 9.671 acres was rejected as non-compliant with the town's zoning ordinance.[205]  When the developer threatened to sue regarding the zoning ordinance, the Town Council of Camden agreed to a settlement that gave the developer the right to build 68 homes on 8.193 acres.[206]  In other words, the Town ceded its power to zone in the public interest for a benefit—withdrawal by the developer of a threatened legal action.  This Court found that the settlement was invalid because the Town Council "may not, under the guise of compromise, impair a public duty owed by it" by "bargain[ing] away part of its zoning power to a private citizen.  [The town] simply

---

[203] *Id*. (quoting *Hartman v. Buckson*, 467 A.2d 694, 700-01 (Del. Ch. 1983)).
[204] 467 A.2d 694 (Del. Ch. 1983).
[205] *Id*. at 696.
[206] *Id*.

52

does not possess the authority to normally contract such authority. . . . [T]he contractual agreement is deemed an invalid *ultra vires* exercise of municipal authority."[207]

The "Penalties" clause at issue here is not contract zoning under Delaware law because there is simply no "bilateral agreement committing the zoning authority to a legally binding promise."[208] It is not contract zoning, because there was no contract, just the rezoning itself. The "Penalties" clause supports one of many conditions in the Ordinance, and relates to the affordable housing element of the development. The Council did not bargain away its future use of the police power.[209] Instead, the "Penalties" clause simply requires OA Oaks to pay Sussex County the rent collected from any Excess Market Rate Units. As subsequent case-law makes clear, the gravamen of contract zoning is the bargained-for concession to rezone, outside the public rezoning process.[210]

---

[207] *Port Penn*, 2019 WL 2077600, at *8 (quoting *Hartman*, 467 A.2d at 699–700).

[208] *See Wilmington Sixth Dist. Cmty. Comm. v. Pettinaro Enters.*, 1988 WL 116496, at *4 (Del. Ch. Oct. 27, 1988).

[209] *See* 3 Rathkopf's The Law of Zoning and Planning § 44:11 (4th ed.) ("Today, illegal contract zoning is likely to be found only where there is an express bilateral agreement that bargains away the local government's future use of the police power.").

[210] *See Port Penn*, 2019 WL 2077600, at *8 ("The pleadings before me do not indicate that the County rezoned any land as part of the settlement agreements, which is a necessary element of . . . contract zoning"); *Pettinaro Enters. v. Stango*, 1992 WL 187625, at *5 n.9 (Del. Ch. July 24, 1992) (stating that a binding agreement prior to official consideration of the rezoning is a requirement of illegal contract zoning).

Here, there was no bilateral bargain. The owner and developer sought a rezoning of the Property, and the Council held public hearings, created a record, and granted the rezoning. It is true that the Council has imposed conditions on the rezoning, including that OA Oaks rent a portion of its units to lower-income individuals, which was among the reasons that the Council approved the rezoning. It is also true that Council put in place a penalty as an incentive to OA Oaks' compliance with the condition. Missing, however, is a bargained-for promise by the Council to rezone: "there is no evidence that the Council bound itself, prior to the official consideration of the request, to grant the re-zoning."[211] Without such a pre-deliberation contract, there is no illegal contract zoning. In fact, far from ceding its future application of its authority, the Council provided that if the apartment development were not constructed as contemplated, the zoning would revert to AR-1.[212]

In the same *ultra vires* vein, the Plaintiffs also argue that the "Penalties" clause "extends beyond the authority granted to the County by the General Assembly in 9 *Del. C.* § 6902, which zoning powers, however broadly defined, do not include imposition of fines for business activities."[213] In support of this proposition, the Plaintiffs cite scattered provisions of the Sussex County Code that do provide the

---

[211] *Pettinaro Enters.*, 1992 WL 187625, at *5 n.9.
[212] PX 16, at 4.
[213] Pls.' Reply Br., D.I. 33 ("Pls.' Reply Br."), at 27.

54

Council with explicit authority to impose conditions.[214] The Plaintiffs also argue that the Application did not include a Conditional Use element pursuant to Article XXIV of Chapter 115 the Sussex County Code, and even had the Application done so, the Plaintiffs argue, the Council could have only regulated "location and site plan aspects of the proposal," not incentivize business practices on the Property.[215]

The Plaintiffs citation to Article XXIV of Chapter 115 the Sussex County Code is inapposite, because that Article is to "provide for certain uses which cannot be well adjusted to their environment in particular locations" including drive-in theatres, borrow pits, livestock auction markets, cemeteries, crematoria, marinas, yacht clubs, swimming clubs, tennis clubs, manufactured home parks, parks or campgrounds.[216] Nowhere does this Article limit conditions that the Council may impose on an RPC development as an incentive for compliance with a permitted use. The Plaintiffs' citations to other Sections of the Sussex County Code likewise do not pertain to this matter.

Contrary to Plaintiffs' arguments, 9 *Del. C.* § 6902 implies the Council's power to impose conditions. It provides that "[t]he county government may . . . regulate . . . the location and uses of buildings . . . ."[217] Existing provisions of the

---

[214] *See id.* at 27–28 (citing Sussex Cty. C. §§ 115-125, 115-218 E).
[215] *Id.* at 28.
[216] Sussex Cty. C. Ch. 115, Art. XXIV.
[217] 9 *Del. C.* § 6902.

55

Sussex County Code providing for financial penalties for violations of the Code support this conclusion.[218] The Plaintiffs have offered no contrary authority other than to cite to Sections of the Sussex County Code specifically *enabling* the use of conditions in particular circumstances. None of those authorities support the Plaintiffs' position that imposing a financial incentive to encourage compliance with a condition to approval of a rezoning is outside of the Council's powers pursuant to 9 *Del. C.* § 6902, and I find that the Council's action in this regard was not *ultra vires*.[219]

### D. The Rezoning Was Not Spot Zoning

As what appears to me to be a final "Hail Mary," the Plaintiffs argue that the rezoning should be invalidated because it constitutes unconstitutional or impermissible spot zoning. At common law, the maximum development of real property was encouraged, and property owners' rights to develop were limited only by tort concepts such as nuisance and trespass. As zoning codes were adopted, states and municipalities began to limit the use to which owners could put property, in the interest of the perceived public good. However, regard for due process required that

---

[218] *See* Sussex Cty. C. §§ 115-191.2, 115-191.7, 115-229.
[219] I note that this argument departs from the main thrust of the Plaintiffs' objections to the rezoning and the statements of objectors at the public hearings. None, so far as I am aware, were concerned with the mechanism for enforcement of the low-income housing component of the proposed development, though the Plaintiffs aver that they had "no opportunity to comment on the proposed 'Penalty,' as it was submitted after the public hearing and addressed by [the] Council immediately prior to their vote." Pls.' Opening Br., at 56.

the property owners be free, at least, from arbitrary or discriminatory seizures of property rights. It is this concern that animates the requirement that rezoning applications not be acted upon arbitrarily or capriciously, and, before the widespread adoption of comprehensive development plans to guide zoning decisions, it animated the prohibition against spot zoning, as well.

In *McQuail v. Shell Oil Co.*,[220] the Delaware Supreme Court stated that spot zoning is "generally defined as an attempt to wrench a small lot or a small area from its environment and give it a new rating that disturbs the tenor of the community. Normally, spot-zoning benefits a private interest and has no relation to the general public interest."[221] This Court observed in *Scarborough v. Mayor and Council of Town of Cheswold*[222] that "[t]he hallmark of spot zoning is the extension of special treatment, usually preferential, to the owner of a small parcel of land which differs in no reasonable regard from that of his neighbors."[223] In evaluating whether a rezoning alleged to be spot zoning is valid, several factors may be considered including "whether the differently-zoned land was unfit for the uses allowed in the surrounding lands or was inherently distinguishable from those lands" and "is whether the land whose zone differs from neighboring land, or the neighboring land

---

[220] 183 A.2d 572 (1962).
[221] *Id*. at 579 (internal citations omitted).
[222] 303 A.2d 701 (Del. Ch. 1973).
[223] *Id*. at 705.

itself, is host to a nonconforming use."[224]  Notably, my research indicates that spot

zoning has never been employed to invalidate a zoning ordinance in Delaware.[225]

Spot zoning is most likely to occur in the absence of a formally-adopted

comprehensive plan.  In that case, rezoning decisions are essentially ad hoc, yet due

process requires that zoning decisions are consistent with some overarching plan or

design; otherwise, the rezoning represents an arbitrary exercise of power.  Thus, our

Supreme Court in *McQuail* stated that "[t]he requirement that there be a plan is

satisfied if the change of zoning classification bears some reasonable relation to the

scheme of zoning adopted in the basic zoning code."[226]

But post-*McQuail*, Delaware has imposed a Comprehensive Plan on Sussex

County, and I have found the rezoning here compatible with that plan.[227]  In such a

case, to my mind, the spot zoning prohibition is subsumed within the requirement

that the Council act consistently with the Comprehensive Plan.  Such a reading

comports with the review of spot zoning claims in sister states.  While spot zoning

---

[224] *Hudson v. Cty. Council of Sussex Cty.*, 1988 WL 15802, at *4 (Del. Ch. Feb. 24, 1988), *aff'd*, 549 A.2d 699 (Del. 1988).
[225] *Deibler v. Sea Gate Vill.*, 1983 WL 142507, at *2 (Del. Ch. Aug. 24, 1983).
[226] *McQuail*, 183 A.2d at 578.
[227] *See Friends of the H. Fletcher Brown Mansion v. City of Wilmington*, 2013 WL 4436607, at *10 n.101 (Del. Super. July 26, 2013), *aff'd*, 85 A.3d 88 (Del. 2014) ("In many states, a comprehensive plan is not a separate or distinct document.  In these states, courts instead infer a plan from zoning rules.  In 1962, but not today, Delaware was among these states, and in *McQuail v. Shell Oil Co.*, the Supreme Court held that '[t]he requirement that there be a plan is satisfied if the change of zoning classification bears some reasonable relation to the scheme of zoning adopted in the basic Zoning Code.'  A plan is thus the spirit of zoning rules, and this relationship does not end just because local governments must now reduce their plans to writing under Delaware law." (internal citations omitted)).

58

is defined differently across states, generally the term refers to a rezoning of a tract of land that does not reasonably further the general welfare or that is not reasonably consistent with the overarching comprehensive zoning plan.[228] Likewise, many states hold that zoning in accord with a comprehensive plan—that is, an inferred scheme of zoning regulations, not a formally adopted plan—cannot be spot zoning.[229] In *Green v. County Council of Sussex County*,[230] this Court held that to comply with the Federal Constitution, a zoning regulation must be in accordance with "*a* comprehensive plan," *i.e.*, "ascribable to or consistent with some rational plan or purpose" and "it is this requirement that is violated when a zoning regulation is struck down as impermissible 'spot zoning.'"[231] *Green* then continues that where a formal comprehensive development plan has been adopted, such as in Delaware, zoning regulations must not only be "ascribable to some rational scheme that seeks to achieve the public welfare"—that is, "non-arbitrary" and consistent with *a*

---

[228] 3 Rathkopf's The Law of Zoning and Planning § 41:2 (4th ed.).

[229] *Loh v. Town Plan & Zoning Comm'n of Town of Fairfield*, 282 A.2d 894, 897 (Conn. 1971) ("Since the change of zone, as we have previously indicated, is in harmony with the comprehensive plan, it cannot be classified as spot zoning."); *Evans v. Teton Cty.*, 73 P.3d 84, 89 (Idaho 2003) ("A claim of 'spot zoning' is essentially an argument the change in zoning is not in accord with the comprehensive plan."); *Town of Juno Beach v. McLeod*, 832 So. 2d 864, 867 (Fla. Dist. Ct. App. 2002) (citing *S.W. Ranches Homeowners Ass'n v. Broward Cty.*, 502 So.2d 931, 935 (Fla. 4th DCA 1987 for the proposition that a "zoning change [was] not spot zoning because it was consistent with the purposes of the comprehensive plan."); *Walus v. Millington*, 266 N.Y.S.2d 833, 839 (Sup. Ct. 1966), *aff'd sub nom. Walus v. Gordon Realty Corp*, 297 N.Y.S.2d 894 (N.Y. Sup. Ct. App. Div. 4th Department 1969) ("[i]f the change accords with a comprehensive plan, it is not spot zoning even though the amendment benefits a single plot . . . .").

[230] 508 A.2d 882 (Del. Ch. 1986), *aff'd*, 516 A.2d 480 (Del. 1986).

[231] *Id*. at 889.

comprehensive plan, per the above—but also "consistent with or in accordance with the particular scheme portrayed in the adopted comprehensive development plan."[232] *Green* proceeded to review the zoning change solely under the more stringent standard of compliance with the Sussex County Comprehensive Development Plan.

Thus, by stating that spot zoning occurs when zoning regulations are not "ascribable to or consistent with some rational plan or purpose" *Green* defines spot zoning for purposes of Delaware law as violating that lower standard of proof against which zoning regulations are examined where a formal comprehensive plan has not been enacted.[233]

Because Delaware law mandates the adoption of a formal comprehensive development plan, it is unsurprising that *McQuail*'s "reasonable relation" standard has fallen into desuetude; *Green* itself stated that *McQuail*'s standard was "inapposite" when assessing conformity with a particular previously-adopted plan.[234] I conclude that, where a zoning change has been found to be consistent with the particular adopted comprehensive plan *and* not arbitrary or capricious, it would be redundant to subject such rezoning to additional spot zoning review. That is because review under the particular comprehensive plan—under *Green*—is *more searching* than the *McQuail* standard. Additionally, any potential daylight for a spot

---

[232] *Id*. at 890.
[233] *Id*. at 889–90.
[234] *Id*. at 890.

zoning claim between the *Green* standard and a review under *McQuail*'s "reasonable relation" standard is covered by a review of whether the rezoning is arbitrary or capricious.[235] Therefore, since the rezoning here is both consistent with a formally adopted comprehensive plan and not arbitrary or capricious, it is not spot zoning under Delaware law.

## III. CONCLUSION

The Plaintiffs, via their steadfast opposition at public hearings, through their pleadings, and by the arguments of their counsel, have consistently voiced their opposition to this rezoning. It is clear that they sincerely wish to preserve the environment and natural heritage of a beautiful area of Sussex County, and have, I presume, understandable concerns for their property values. The Plaintiffs, however, were afforded the opportunity to make their opposition known to the legislative body with the authority to approve this rezoning. They did so. The constraints on the Council are two-fold; legal, by which the County is bound to act based upon a sufficient record, state the reasons for its action, and not act in a manner that is violative of law or arbitrary and capricious; and political. I have examined

---

[235] *See id*. at 889 ("Any regulation that discriminates, as zoning regulations inevitably do, must, in order to satisfy the equal protection clause of the federal constitution, be ascribable to or consistent with some rational plan or purpose. It is this requirement that is violated when a zoning regulation is struck down as impermissible 'spot zoning.'").

61

the record and determined that the Council acted in accord with the first constraint. That is the limit of my authority here.

For the foregoing reasons, the Defendants' Motion for Summary Judgment is granted, and the Plaintiffs' Motion for Summary Judgment is denied. The parties should submit a form of order consistent with this Memorandum Opinion.